**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CITY OF STERLING HEIGHTS POLICE AND FIRE RETIREMENT SYSTEM, Individually And On Behalf Of All Others Similarly Situated, | ) NO.: 05-cv-2141-DC<br>)<br>)<br>)<br>) |
| Plaintiff, | ) |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| ABBEY NATIONAL, PLC and IAN HARLEY, | )<br>) |
| | ) |
| Defendants. | ) **DESIGNATED ECF CASE** |

**AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiff, The City of Sterling Heights Police and Fire Retirement System ("plaintiff"), has alleged the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Abbey National Plc. ("Abbey National," "Abbey" or the "Bank"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Bank, press releases and other public statements issued by the Bank, and media reports about the Bank.

**SUMMARY OF ACTION**

1.      This is a federal class action brought on behalf of purchasers of Abbey National American Depository Receipts ("ADRs") between July 24, 2001 and June 10, 2002, inclusive (the "Class Period"), seeking to pursue remedies under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated by the SEC pursuant thereto, against Abbey and its then-Chief Executive Officer, Ian Harley.

2.      Abbey, a former building and loan society, is one of Britain's largest mortgage and consumer lenders. From the time Abbey went public, in 1989, until 1998, Abbey was the best-performing stock in the FTSE-100. That same year, defendant Harley, a Bank employee since 1977 who worked his way up the ranks, became Abbey's Chief Executive Officer.

3.      At the start of the Class Period, in mid-2001, defendants reported that Abbey was "in better shape than ever." Defendants announced that double-digit profits had been earned by Abbey's wholesale banking division during the first half of 2001. While acknowledging a weakening of the U.S. economy, defendants assured investors that the credit quality of Abbey's holdings was "tightly managed" and that the softening of the U.S. market afforded Abbey an opportunity to purchase "good quality, investment grade" assets. Further, Abbey assured investors that provisions had been made against "specific exposures that may need to be written off in the future."

4.      As alleged in detail below, in public statements made over the next few months, defendants consistently reiterated these themes. In fact, when wholesale banking division head Gareth Jones resigned in October 2001, investors were not only told that Abbey was still "in very good shape," but, with respect to the wholesale banking business, they were specifically assured by defendant Harley that: "There are no black holes . . . There are no serious problems."

5.      Actually, there were serious problems – problems which existed for quite some time. Starting in the mid-1990s, Abbey management, including Harley, had been warned that the wholesale banking division was poorly managed and that its high-risk investments were not well-monitored. Specifically, contrary to the hands-on, conservative management style publicly portrayed by Abbey, decision-making in the treasury division of wholesale banking, known as "ANTS," "was based on an attitude of 'political self-interest, protecting the status quo and resisting commercial logic.'"

6.     There were also several major black holes that would soon drain Abbey of hundreds of millions of dollars. The first black hole was the Enron debacle. In late November 2001, Abbey was forced to take a charge of £95 million just days after Enron imploded. At that time, the new wholesale banking division head, Mark Pain, minimized this occurrence, telling investors: "Nothing else in our books gives me huge cause for concern." However, unbeknownst to Abbey's investors until after the Class Period, the wholesale banking division had very significant holdings in WorldCom and Tyco as well. Former division head Jones specifically told Pain, upon his departure in October 2001, that Abbey needed to obtain credit protection against Abbey's £500 million exposure to Tyco.

7.     Throughout the first half of 2002, revelations of massive fraud concerning Tyco and WorldCom shook the U.S. markets. In a market environment described as a "panic," shares of both companies lost more than 44% of their value in just the first two months of 2002. Meanwhile, across the Pond, defendants concealed Abbey's exposure to these massive collapses. In a *Bloomberg News* interview in late February 2002, Harley stressed that the Bank had made not only "appropriate," but "very conservative" provisions for bad debt, and that defendants were "very happy with the present situation." Mark Pain reiterated this point in a March 8, 2002, presentation to analysts, characterizing Abbey's provisions for losses as not only "appropriate" but "conservative."

8.     In both March and April 2002, Abbey filed financial statements with the SEC. Neither filing made any reference to any losses that Abbey would sustain as a result of the collapses of Tyco and WorldCom.

9.     In late April, Abbey held its annual shareholders meeting. Defendants again failed to inform investors of Abbey's huge probable losses on its Tyco and WordCom holdings. In June 2002, Harley defended his actions, claiming that Tyco's financial condition did not deteriorate until

late May 2002 – *after* the April 25, 2002, meeting. Like his other public statements during the Class Period, this was simply untrue and flew in the face of the well-publicized chronology of Tyco's downfall.

10.     In the Bank's June 2002 report of its operations for the first half of 2002, Abbey shocked investors and analysts by announcing that provisioning for bad debt for the first six months of 2002 was £256 million – the amount previously announced to cover the *entire year* – with an additional £194 million for the second half of 2002. Only after defendant Harely was forced to step down was it revealed, after the Class Period, that the shocking £450 million provision for 2002 was actually a mind-boggling *£902 million*. Moreover, for the first time since it went public, Abbey reported a loss – a loss of *£984 million.*

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities

markets.

**PARTIES**

15.     Plaintiff, The City of Sterling Heights Police and Fire Retirement System, as set forth in the accompanying certification incorporated by reference herein, purchased the securities of Abbey National during the Class Period and has been damaged thereby.

16.     Defendant Abbey National Plc is a corporation organized under the laws of England with its principal executive offices situated at 2 Triton Square, Regent's Place, London NW1 3AN, England. The Bank operates a financial services group in the United Kingdom. Abbey provides personal savings and mortgages, secured and unsecured lending, banking, pensions and investments and other financial services. During the relevant period, Abbey had several divisions, including Wholesale banking, Retail, Business to Consumer, and Business to Business.

17.     The Wholesale division included the Abbey National Treasury Services plc ("ANTS") unit. The Wholesale bank, mostly through ANTS, participated in five main international financial markets: wholesale lending, asset financing, asset-backed investments, risk management and financial products, and securities financing. As the group's treasury, ANTS provided liquidity, funding, capital management and risk management services to the Group. The operations of ANTS were fully and unconditionally guaranteed by Abbey. The guarantee allowed ANTS to benefit from the same credit rating as Abbey, even though the unit held riskier assets than the Bank as a whole.

18.     Defendant Ian Harley ("Harley"), at all times relevant to this action, served as the Bank's Chief Executive Officer. (Defendant Harley is sometimes referred to herein as the "Individual Defendant.") Harley began working for Abbey in 1977 as an analyst. In 1993, he became Abbey's Finance Director, which is akin to a Chief Financial Officer. He became Abbey's Chief Executive in 1998.

19.     Because of Harley's position with the Bank, he had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Bank's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to him in connection therewith.

20.     Harley, by virtue of his high-level position with the Bank, directly participated in the management of the Bank, was directly involved in the day-to-day operations of the Bank at the highest levels, and was privy to confidential proprietary information concerning the Bank and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Harley was variously involved in making, drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Bank, and approved or ratified these statements, in violation of the federal securities laws.

21.     As an officer and controlling person of a publicly-held company whose ADRs were, and are, registered with the SEC pursuant to the Exchange Act, and traded on the OTC Market (the "OTC"), and governed by the provisions of the federal securities laws, Harley had a duty to disseminate promptly, accurate and truthful information with respect to the Bank's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Bank's publicly-traded securities would be based upon truthful and accurate information. Harley's

misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     Harley participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and was aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of his Board membership and executive and managerial position with Abbey National, Harley had access to the adverse undisclosed information about Abbey National's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Abbey National and its business issued or adopted by the Bank materially false and misleading.

23.     Harley, because of his position of control and authority as an officer and director of the Bank, was able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Bank during the Class Period. Harley was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, Harley is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

24.     Harley is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Abbey ADRs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Abbey's business, operations, management and the intrinsic value of Abbey ADRs; and (iii) caused plaintiff and other members of the Class to purchase Abbey ADRs

at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the ADR securities of Abbey National between July 24, 2001 and June 10 2002, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Bank, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Abbey ADRs were actively traded on the OTC Market. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by defendants' acts as alleged herein;

    b.    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Abbey; and

    c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Summary of the Fraud and Background Facts

31.    Abbey National took its name in 1944 upon the merger of the Abbey Road Building Society with the National Building Society. Abbey, however, had roots that extended into back into 19th Century social reform. According to an article published in the June 1998 issue of *Management Today*, Abbeys' tradition was a then-current influence on its "corporate ethos," and created a "very distinctive culture." In fact, some argued that the Bank's "obsession with its distinctive culture may

lead it to take its eye off the ball."

32.    As a building society, Abbey was owned by its members (rather than by shareholders), paid interest on deposits, and lent money to its members to enable them to buy their own homes. Thus, its core business traditionally had been retail banking and mortgages. In the mid-1980s, the bank enjoyed its "glory days" in the savings and loans market. By 2002, Abbey was Britain's second largest mortgage bank and sixth largest bank overall.

33.    In 1989, the Bank, dropped its building society status and became a publicly traded company. Also that year, the Bank established the Abbey National Treasury Services ("ANTS") as a unit in its Wholesale banking division. Gareth Jones was hired by Abbey as group treasurer and CEO of ANTS.

34.    In the early part of the 1990s, under the leadership of former CEO Peter Birch, Abbey pursued a policy of aggressively acquiring smaller banks. During the balance of the decade, Abbey enjoyed great success. By 1997 the Bank had doubled its profits from what they were earlier in the decade, and was the best performing stock in the FTSE-100 between1989 and 1998.

35.    In March 1998, Harley became Abbey's CEO, and promptly began pursuing a business strategy that moved beyond the Bank's traditional retail banking and mortgage services into corporate banking. As part of its entry into the corporate sector, Abbey, through its Wholesale division, began providing commercial lending and undertook risky investments, such as investments in private equity and corporate bonds, including junk bonds. Rather than acknowledge these new forays into unfamiliar territory, Harley told *Management Today*, in June 1998, that his goal as Abbey's new leader was to increase the Bank's retail market share and make the retail division more efficient. The article further stated that "[n]o one doubts that Harley knows what he wants to

concentrate on: making Abbey better at what it is good at."

36.     Entering the field of corporate banking without initial fanfare – or disclosure – the Bank purchased, among others, the bonds of Enron Corp., Tyco International Ltd., and WorldCom, Inc. During the high-tech, "dot.com" boom years, the Wholesale division posted impressive results, contributing to almost a third of Abbey's entire profit by 2001. Abbey was so successful that its ANTS unit opened up an office in Stamford, Connecticut in 2001, its first office in the United States.

37.     However, all was not as well as it appeared at the Bank during this period. Unbeknownst to the investing public, members of the ANTS unit had voiced criticisms to senior Abbey management, including Harley, about how the unit was being run. According to an article entitled "Abbey was warned of treasury risks," published in London's *Sunday Times* on June 23, 2002: "Senior executives repeatedly warned Abbey National chiefs in the mid-1990s that the treasury division had weak management, poor risk controls and was heading for heavy losses." The paper stated that it "has seen correspondence from former treasury-division managers in which they detailed their concerns to superiors."

38.     According to the article: "The whistleblowers warned that weak controls were exposing the bank to heavy future losses." The article also noted that: "Former executives said they were not surprised that Ants was now suffering in the market downturn. 'It was bound to catch up with them,'" said one.

39.     The article also revealed that Harley was one of the managers who had been warned when he served as Abbey's finance director. Harley "was told in 1996 that infighting was causing lax discipline, confusion over management responsibilities and low morale, prompting the departure of several senior managers." Previously, in 1994, Harley was warned that the management of

treasury unit of the Wholesale division, ANTS, "was based on an attitude of 'political self-interest, protecting the status quo and <u>resisting commercial logic</u>." (Emphasis added.)

40.     A memo written by another whistleblower stated: "'My experience is that it usually takes three to five years for losses to come out of the woodwork; when that happens in Ants (which it will) who is going to be responsible? Despite repeatedly requesting that we employ managers with experience, this advice was constantly ignored.'"

41.     The article further explained that as ANTS began investing in more complex assets, "no action was taken to monitor them. We put them in the same pot as the straightforward assets and just left them." according to a former manager at Abbey.

42.     Additionally, in late 2000, some of Abbey's largest institutional investors launched a behind-the-scenes campaign to oust Harley. These investors felt that Harley was the Bank's weakest link and "was short on strategic vision," according to the July 15, 2001 edition of London's *Sunday Business*. The attempt ultimately failed. However, subsequently, the newspaper reported that Harley had to work hard "to create the impression that Abbey's independent banking strategy is both credible and sustainable."

43.     Also at the end of 2000, the British financial enterprise Lloyds TSB ("Lloyds") attempted to merge with Abbey. Lloyds made two offers to Abbey's Board in December 2000, both of which were rejected. In January 2001, Lloyds made an offer directly to Abbey's shareholders in an effort to have them persuade the Bank's Board to enter into negotiations. The offer made by Lloyds would have given Abbey shareholders 1.5 shares of Lloyds and £2.60 for each Abbey share, a premium of about 50% over the average price of the Bank's shares during the period. Abbey described Lloyds offer as "inadequate and uncertain" and stated: "if they make an offer on these

terms we will fight them vigorously." True to its word, as the Bank ultimately spent £13 million in defending itself against the merger.

44.     Just as Lloyds' offer was putting pressure of Abbey's Board, the U.K.'s Competition Commission made a ruling blocking the proposed Lloyds' bid. It was heavily rumored that Harley, had secretly approached the Commission and persuaded it to deny approval. This would not be surprising, as Lloyds "made it clear that only [Gareth] Jones had a post-merger future,"according to a report in the October 10, 2001, edition of the *Telegraph*.

45.     The move irked some Abbey shareholders. As the *Financial Times* recounted on July 20, 2002: "Many investors were already concerned about Mr. Harley's commitment to shareholder value after he rejected a bid approach by Lloyds TSB. The bid was blocked by the Competition Commission after Abbey was seen to have lobbied against the deal. Several of the largest shareholders felt Mr. Harley's strategy of independence was taking preference over shareholder value."

46.     Nevertheless, the attempted take over failed, and Harley – again – survived. Thereafter, a bold plan was laid out to move Abbey from being the sixth largest Bank in Britain to the fifth largest bank in the world by 2005. In order to accomplish this, Abbey's Board expected the Wholesale division to triple its profits from £500 million to £1.5 billion.

47.     By this time, 2001, Abbey, and particularly its Wholesale division, was considered a marvelous success. Between 1989 and 2000, the wholesale bank had  never made a single loss on an investment.  According to one rival banker, the Wholesale divisions strategy "was working. They believed they could walk on water."

48.     On July 24, 2001, Abbey released its financial results for the first half of 2001, and announced that it once "again achieved outstanding double-digit growth in both profits and revenue." Abbey, announced that the "slowdown in global markets" caused it to set aside £64 million to cover possible bad loans in the United States, but that the same slowdown also generated opportunities for the Bank to "acquire good quality investment grade assets." The Bank also announced that it expected to set aside *less* money for bad loans during the second half of 2001. Concerning the Wholesale division, Abbey announced that it had profits of £307 million for the half year, up 17%.

49.     On October 8, 2001 Gareth Jones announced that he would be leaving Abbey at the end of the month, remaining "on call" for the rest of the year to offer his successor, Mark Pain, any advice. Jones further stated: "I will do everything I can to help Mark's success." Jones added that the provisioning taken in July was "trivial in the context of profits....The business is in good shape." Reiterating Jones's assurances, Bank spokesman Matthew Young said that "[t]here are no surprises, shocks or gaping holes" in the Wholesale division.

50.     On October 23, 2001, Abbey announced its third-quarter 2001 results, stating: "Profit before tax is running comfortably ahead of last year's levels, despite uncertain market conditions. [and] revenues remain strong...." The Bank again said there were no "black holes" in its Wholesale division, and that there was "no significant deterioration in credit quality" since the first half of 2001.

51.     On November 28, 2001, all three major credit-rating agencies downgraded Enron's bonds to junk status. Abbey's debt exposure to Enron at the time was estimated to be about £115 million. The very next day, Abbey announced that it would take a £95 million provision for its

exposure to Enron. At the time of the announcement, Pain, the new manager of the Wholesale division, reassured investors by stating that full-year profit would likely be "about the same as last year." Moreover, he indicated that, excluding Enron, 2001 was actually the Wholesale's division best year, with operating profits reaching £2.4 billion. Pain provided even more comfort to investors, confidently stating: "Nothing else in our books gives me huge cause for concern."

52.    The new year began with reports surfacing that another major Abbey holding, Tyco, was being investigated by the SEC for possible accounting violations. Immediately, both Tyco's share price and bond price began to fall sharply. On January 23, 2002, in a rush to stem the tide of its plummeting securities values, Tyco announced a radical plan to split itself into four parts, three of which would be offered to the public through public offerings. However, more bad news surfaced, when it was revealed that $20 million was paid to a director to broker an acquisition deal for Tyco. The announcement raised the ire of corporate governance watchdogs. During those first three weeks of January, Tyco's stock price dropped by nearly 25%.

53.    Also around this time, reports surfaced that WorldCom, another of Abbey's substantial holdings, would soon be forced to write off assets when it reported its earnings. The news sent WorldCom' stock price to near ten-year lows.  Thereafter, the business press began carrying stories questioning whether WorldCom was engaging in similar accounting practices as Enron. By the beginning of February, the attitude in markets for WorldCom and Tyco bonds was characterized as "pandemonium and panic". Before the month was over, it was revealed that WorldCom had loaned its CEO Bernard Ebbers nearly $350 million to cover margin calls. WorldCom's stock price also continued to drop over fears that the company's debt burden was too high. Tyco, for its part faired no better, as the conglomerate was forced to tap into emergency credit

facilities, which precipitated the downgrade of its credit rating to one notch above junk status.

54.     Despite these tumultuous events, and Harley's affirmative statement that the Bank "would have to say so" if there were any "black holes" in its Wholesale banking business, during the first seven weeks of 2002, defendants said nothing about Abbey's mounting losses.

55.     On February 21, 2002, Harley was interviewed by *Bloomberg News*. Harley was specifically asked if the Bank had taken sufficient loss provisions and if there was any more risk. Harley answered that the Bank had made "very conservative" and" appropriate" provisions, that it has been "completely transparent," and that it had already acknowledged all of its risk exposure.

56.     As February turned into March, Tyco and WorldCom further disintegrated. For example, the credit-derivatives market – a market that allows institutional investors, like a bank, to take hedge positions for risky debt investments – treated WorldCom as if its credit was junk status. Similarly, *Forbes* magazine questioned, based on the credit-derivatives market reaction to Tyco, whether the company was the "next corporate implosion waiting to happen?"

57.     On March 4, 2002, *Forbes* warns investors to avoid WorldCom because of serious accounting issues, specifically stating that Worldcom inflated its earnings by minimizing the depreciation of MCI assets. One week later, WorldCom became the subject of an SEC investigation into its accounting practices. In between, in a March 8, 2002, presentation to analysts, Wholesale banking chief, Mark Pain, described Abbey's loss provisions as "appropriate" and "conservative." On March 19, 2002, the *Wall Street Journal* reported that Tyco, like WorldCom, had manipulated the accounting of acquired companies in order to artificially boost its results. That same day, March 19, 2002, Abbey's 2001 Directors' Report and 2001 Annual Review were filed in the United States with the SEC under Form 6-K. Although required to do so, Abbey made no disclosures about the

severe deterioration of the value of its Tyco and WorldCom holdings. Abbey's Form 20-F, its Annual Report to the SEC for 2001, filed on March 25, 2002, was also silent regarding these mounting losses.

58. In April, WorldCom's official credit rating had been downgraded by all three credit rating agencies to just above junk status. Shortly thereafter, Ebbers resigned as CEO; the company's stock price by that point was *down 84% since January*. Tyco, also continued to suffer as it announced a $1.9 billion quarterly loss. By the end of April, its stock had *lost 65% of its value since the beginning of the year*.

59. Despite these plummeting prices, at the annual shareholders meeting on April 25, 2002, defendants did not disclose the nature of Abbey's Tyco and WordCom holdings or the need to take substantial additional loss provisions in connection therewith. To the contrary, defendants announced that Abbey expected to meet market expectations for 2002 and did not expect bad debts to rise that much for the year. Harley assured investors that "the pivot has passed" with regard to credit risk.

60. Through the months of May and into June, the situation at both Tyco and WorldCom continued to worsen, culminating in the resignation and subsequent indictment of Tyco CEO Dennis Kozlowski, and the filing by WorldCom of the largest bankruptcy in U.S. history. In all of their Class Period public statements and public filings, defendants omitted any mention of Abbey's holdings in Tyco and WorldCom.

61. Finally, on June 10, 2002, Abbey released its interim results for the first half of the year. The news was shocking. The Bank disclosed that profit before tax for the year was expected to be substantially lower than the market expectations, and the prior year. And was also well out

of line than what the Bank itself announced less that six weeks prior. More amazing still, the Bank announced that provisioning for risky debt in the first six months of 2002 would equal the total for all of 2001, which was £256 million. Abbey further announced that the expected provisioning for the second half of 2002 would be "below the total for the comparable period of 2001." Overall, full-year 2002 provisioning was expected to be £450 million.

62.     Investors, analysts, and the press were shocked by Abbey's announcement. One investor best summed up the general feeling, when he remarked: "I am totally bemused. Abbey National recently held a series of investor meetings that I would have described as upbeat. But this is a catalogue of disasters."

63.     Harley tried to defend himself by attributing the provisioning and consequent poor performance to a downturn in the economy in the period of time *since* Abbey's April 25, 2002 shareholders' meeting. Harley, specifically referenced the downfall at Tyco, stating: "sentiment got markedly worse towards the end of last month [May 2002], with the collapse of Tyco, and the US economy has flattened."

64.     However, as set-forth herein, the problems at Tyco, as well as WorldCom and the U.S. economy, had been deteriorating throughout at least the first half of 2002. There was nothing unusual that occurred after the end of April 2002 that wasn't already present before hand. Moreover, unbeknownst to the investing public, Abbey had been specifically warned about its huge exposure to Tyco by former Wholesale banking chief Gareth Jones -- £500 million – upon his departure in October 2001. Concerning Tyco, Jones' told his successor Mark Pain at the time, "whatever you do, take out some credit protection."

65.     It was later revealed that defendants misrepresented Abbey's risk exposure, even at

the end of the Class Period – despite claims that its provisioning was "adequate" and "conservative." It was after Stephen Hester was hired as the Bank's new finance director, on April 25, 2002 that Abbey began to uncover that serious risks had been completely concealed. Abbey conceded this when it formally announced its interim results in July 2002. In a Power Point presentation, Hester and Abbey Chairman, the Lord Burns, outlined that going forward, the Bank would "improve transparency, reduce risk of 'surprises,'" and take a "more conservative stance on provisioning."

66.    Again, in November 2002, Abbey stated that it "will also continue the practice adopted at its half-year results of increasing transparency of its financial reporting enabling clear external assessment of business performance as well as exposures still carried by the Group." (Emphasis added.) Analysts following Abbey also acknowledged that the increased provisioning was attributed to Hester's appointment.  For example, analysts at Morgan Stanley remarked: "With a new finance director entering the business...there was always a chance the numbers for '02 would be 'cleaned up.'"

67.    In fact, Abbey started cleaning house immediately after reporting its dismal half-year performance on June 10, 2002. *The next day* Abbey announced plans to restructure the Wholesale division. Thereafter, several prominent members of the unit left the bank, including Alex Braun, head of funding and asset management at the division, and Paul Caldwell, head of asset backed securities.

68.    On July 19, 2002, Harley was finally forced out as Abbey's CEO, under intense pressure from investors. Indeed, several prominent institutional investors were reported to have contacted Abbey's Chairman Lord Burns to specifically request Harley's dismissal. Lord Burns

filled the role of interim CEO. Lugman Arnold assumed the post permanently in October 2002.

69.     With new management fully in place, on November 27, 2002, Abbey announced that it would post a loss for 2002. This was the first time in Abbey's history as a public company that it was in the red. Specifically, on December 3, 2002, Abbey preliminarily announced a pre-tax loss of £ 947 million. Abbey also disclosed a staggering boost in loss provisions to £902 million for the year, well above the £450 million guidance the Bank gave on June 10, 2002, when defendant Harley was still at the helm.

70.     *Bloomberg News* further reported that: "Abbey. . . , the U.K.'s second-biggest mortgage lender, will cut its dividend, sell assets and shed jobs . . . The London-based bank, which invested in bankrupt companies such as Enron...and WorldCom. . . , will write down about 500 million pounds ($776 million) for holdings in its insurance unit . . . ." The article further stated that: "Shares in Abbey..., which last year had net income of 1.28 billion pounds, have dropped more than any U.K. bank this year as the lender was hurt by stock market declines and debt from companies such as Enron . . . and WorldCom . . . ."

71.     The following day, *Bloomberg News* reported that Abbey was seeking to sell some of its businesses, and "restore profit by focusing again on mortgage and savings products...." The report noted that "[t]he bank is turning its back on forays into corporate lending and investing in companies such as Enron...and WorldCom...."

72.     The following day, *Bloomberg News* reported that Abbey was seeking to sell some of its businesses, and "restore profit by focusing again on mortgage and savings products . . . ." The report noted that "[t]he bank is turning its back on forays into corporate lending and investing in companies such as Enron . . . and WorldCom . . . ."

73.     On February 5, 2003, Abbey was able to execute the sale of its First National unit to General Electric. *Bloomberg News* reported, however, that: "The more difficult sales are yet to come, investors said, as Abbey . . . seeks to unload loans made to companies and its corporate bond holdings . . . ." The article continued:

> Arnold wants to dispose of loans and investments held at Abbey National's wholesale banking unit . . . .The wholesale bank's holdings included corporate bonds and private-equity investments. Abbey National set aside 95 million pounds in 2001 for loans to Enron . . . .The bank held about 20 million pounds of WorldCom [] bonds and 60 million pounds of Tyco [] securities in June. The unit was the bank's treasury when Abbey National sold shares to the publis in 1989, and expanded into a "warehouse for risk" during the 1990s, UBS Warburg analysts said last month. "Getting rid of a company is easy compared with the difficulty that lies ahead in disposing of Abbey National's corporate bond portfolio," said James Leal, an analyst at Gerrard Ltd...." The bank may have to hold a "significant " amount of those assets until 2006, UBS Warburg . . . said.

74.     On or about March 7, 2003, Abbey released its 2002 Annual Review. In the review, the Lord Burns and Arnold jointly apologized for Abbey's unprecedented red ink: "The losses before tax for the Abbey National Group of £984 million is extremely unsatisfactory. On behalf of the whole Board, we would like to express our regret for the results and dividend cut that we have announced." (Emphasis added.)

75.     The ramifications from the collapse of the Wholesale banking division continued in 2003, as the Bank announced a pre-tax losses of £1.3 billion for the year. The next year, management finally reported that Abbey was back in the black, announcing on July 26, 2004, a pre-tax profit for the first six months of £350 million.

76.     That same day, Abbey announced that its Board had approved the acquisition of the Bank by Banco Santander, Spain's largest bank. On October 14, 2004, Abbey's shareholders approved the merger, which formally closed on November 12, 2004.

77.     To this day, the exact amount and nature of Abbey's holdings in Tyco and WorldCom – and the losses stemming therefrom – is largely unknown. Abbey failed to disclose its holdings when it published its half-year and full-year financial results. Moreover, many of Abbey's holdings, such as those it had of WorldCom, were issued in the form of "bearer bonds." Ownership of such bonds is nearly impossible to trace, and only if Abbey chose to disclose its holdings, would investors be aware of the Bank's investments. Contrary to Abbey's Class Period claims of being "completely transparent," investors had no way of ascertaining that defendants recklessly misrepresented the risks to which they were exposed.

**Defendants' Materially False And Misleading Statements Issued During 2001**

78.     The Class Period begins on July 24, 2001. On that date, Abbey National issued a press release announcing the Bank's financial results for the first half of 2001. The press release indicated that the Bank's first quarter profit grew at a smaller than expected 12%, after Abbey National included a write-down of £64 million to cover possible bad loans in the United States. This relatively paltry write down, however, masked the true but undisclosed exponentially higher level of loss exposure that confronted Abbey with its overly risky debt securities portfolio. Defendants hid the existence of this exposure – and even the very identity of which bonds Abbey held – throughout the Class Period by constantly conditioning the investing public to believe that defendants were continuing to maintain tight control over the credit quality of Abbey's investment portfolio.

79.     The press release stated in pertinent part:

Chief Executive's Review - sustaining our track record of profitable growth, well placed to take advantage of future opportunities.

<u>Abbey National is in better shape than ever</u>. We have forged ahead with the business in the first half, and have not allowed the corporate uncertainty of recent months to steer us off course. We have again achieved outstanding double-digit growth in both profits and revenue.

(Emphasis added.)

80.    The press release further touted Abbey's**:**

Double-digit profit growth in Wholesale Banking

Wholesale Banking delivered another <u>strong</u> performance, with pre-tax profits rising 17% to £307 million. Whilst the slowdown in global markets affected certain business lines and increased provisioning levels, it also generated significant opportunities to acquire <u>good quality, investment grade assets</u>. The Wholesale Bank continued its <u>strong track record of double digit profit growth</u>,....

(Emphasis added.)

81.    The press release elaborated further under the heading "Wholesale Banking":

<u>Wholesale banking delivered another strong performance,</u> with pre-tax profits rising 17% to £307 million. A slowdown in global markets, triggered by a weakening of the US economy, affected certain business lines such as private equity realisations, and also drove an increase in provisioning. This dampened short-term profit growth, but generated significant opportunities to acquire <u>good quality, investment grade assets</u>.

\* \* \*

<u>Credit quality remains tightly managed</u>, with the increase in provisions reflecting the slowdown of the US economy and subsequent rating downgrades in the investment portfolio. <u>Provisions have also been made against specific exposures that may need to be written off in the future</u>.

(Emphasis added.)

82.    During a conference call following the release of Abbey National's interim results, defendant Harley told participants that, despite plans to pursue expansion in its wholesale banking business, among other things, the Bank expected to set aside <u>less</u> money for bad loans during the

second half of 2001.

83.     The rosy statements in the July 24th press release concerning the "strong" performance of the Wholesale Bank; Abbey's intent to acquire good quality, investment grade assets; and defendants' tight management of credit quality masked the true but undisclosed alarmingly high level of loss exposure that confronted Abbey with its overly risky debt securities portfolio. Defendants hid the existence of this exposure – and even the very identity of which bonds Abbey held – throughout the Class Period by constantly conditioning the investing public to believe that defendants were continuing to maintain tight control over the credit quality of Abbey's investment portfolio.

84.     Approximately eight weeks later, on October 8, 2001, Gareth Jones, the head of Abbey National's wholesale banking division, abruptly resigned his position. Under Jones, the Bank's wholesale banking business had grown to provide approximately one-third of Abbey National's annual profits. News of his resignation caused some speculation about the health of the Bank's wholesale banking business. A Bank spokesman, however, expressly dissipated those concerns by telling *Bloomberg News* that "there are no surprises, shocks or gaping holes" in Abbey National's wholesale banking division:

> Abbey National Plc said Gareth Jones will step down as head of the wholesale banking division at the end of the month to pursue "fresh challenges."
>
> Jones, 52, a 13-year veteran of Britain's second-largest mortgage lender, will be replaced by Finance Director Mark Pain. The departure, almost three months after Jones' division said it wrote off 64 million pounds ($94 million) in fixed-income investments in the first half, came at the initiative of both Jones and senior management, said Chief Executive Ian Harley.
>
> ***
>
> Abbey National said in a statement the business is performing ``well and is in very good shape.'' The company on Oct. 23 will release a statement on trading in the third quarter.

"<u>There are no surprises, shocks or gaping holes</u>" in the wholesale banking unit, spokesman Matthew Young said.

\*\*\*

"Business is performing in line with expectations," Harley said in an interview. This year's numbers "are in excess of last year's numbers." Pretax profit in wholesale banking rose 17 percent to 307 million pounds in the first half. Analysts said the company may struggle to boost growth at the same pace.

"The focus will be on growing value rather than growing profits," said Mark Pain in an interview. "We'll focus on return on capital. <u>We think it's a great business we've built there, and we haven't been able to fully sell that story to our investors.</u>"

\*\*\*

"We see a U.K. economy in good shape," Harley said. "We're exhibiting more caution in terms of retail lending" and have been <u>curtailing high-yield lending</u> in recent months, he said.

(Emphasis added.)

85.    In the Bank's SEC Form 6-K dated October 9, 2001 and filed on or about October 22, 2001, defendants disclosed the departure of Mr. Jones as follows:

Abbey National today announces that Gareth Jones will be resigning from the Board of Abbey National plc and Abbey National Treasury Services plc with effect from 31 October 2001.

Ian Harley, Group Chief Executive, said: "I would like to thank Gareth for his immense contribution in building the Wholesale Banking operations of Abbey National into a substantial and business and successful business which has delivered consistent double-digit profit growth over the last six years. <u>The business continues to perform well and is in very good shape as it moves into the next stage of its development</u>. I am delight that delighted that Mark will be taking this business forward and adding to his already considerable experience throughout the Group."

The Wholesale Bank is trading in line with expectations and Abbey National will issue its regular Autumn trading statement on 23 October.

(Emphasis added.)

86.     Defendants' understated disclosures in its October 8th press release and October 22nd Form 6-K downplaying Mr. Jones' departure were materially misleading and completely omitted the fact that, according to media reports subsequently published on June 16, 2002 and described in greater detail below, Mr. Jones claimed that he had actually "voiced my worries about [the riskiness of Abbey's wholesale banking business' investment strategy from the outset, arguing that the returns on private equity debt would be too erratic and that a move into high yield debt would incur bad debts." Further, the June 16, 2002 *telegraph.uk.com* reported that "Mr. Jones says that <u>at the time of his departure</u> [i.e., in October 2001] he [had] raised serious concerns about what he estimated to be Abbey's £500m exposure to bonds issued by Tyco, the troubled American conglomerate." (Emphasis added.) Defendants, however, disclosed none of this information to the investing public.

87.     On October 23, 2001, Abbey National issued a press release announcing the Bank's third quarter 2001 financial results. The press release included a statement by defendant Harley, who stated, among other things, that there was "<u>no significant deterioration in credit quality</u>" since the first half of 2001. The press release stated in pertinent part:

> Chief Executive's Review
>
> The Group has delivered a solid performance in the third quarter. Abbey National's strength across its diversified portfolio of businesses means it is well-positioned to weather the current economic uncertainty.
>
> Business Overview
>
> Profit before tax is running comfortably ahead of last year's levels, despite uncertain market conditions. Revenues remain strong and we are on target to meet our year-end cost objectives for both the Group and the Retail Bank. We have taken a prudent stance on credit over the last two years and have been

benefitting from our significant investment in credit decision-making and debt management systems. As a result, retail and consumer credit quality remains strong. The Wholesale Bank has had a strong third quarter, and profit before tax continues to run well ahead of last year's levels. In the Wholesale Bank, we have seen <u>no significant deterioration in credit quality</u> since the half-year, but the full impact of the heightened volatility in US markets remains uncertain.

88.     Moreover, on October 23, 2001, during a conference call with analysts and financial journalists following the release of the third-quarter financial results, defendant Harley downplayed the negative effects that the U.S. economic slowdown was having on Abbey National's wholesale banking business, telling reporters that: "We anticipate an upturn in the U.S. economy in the second quarter of next year and a relatively gentle landing in the U.K."

89.     According to an October 23, 2001 article appearing in the *Evening Standard*, entitled "Abbey: 'There are no black holes'":

> ABBEY National has assured the City that is has given a solid performance in its third quarter, saying the sudden departure earlier this month of wholesale banking chief Gareth Jones <u>did not</u> mean anything was wrong.
>
> Chief executive Ian Harley said: "<u>There are no black holes and if there were we would have to say so. There are no serious problems</u> and we are continuing to expand the business, as we have shown by opening a branch in the US - In Connecticut."
>
> In wholesale banking, he said, there had been <u>no significant deterioration in credit quality</u> in the quarter but added that the impact of heightened volatility in the US remained uncertain. On the junk bond side, the bank had sold some holdings and 'had not been buying any for the last 12 months'. Junk is now less than 7% of the total wholesale banking portfolio, down to £1.7bn from £1.8bn at the half year.

(Emphasis added.)

90.     In the Bank's SEC Form 6-K dated October 22, 2001 and filed on or about October

---

26, 2001, which reported Abbey's 2001 Interim Financial Results, defendants, in the "Chief Executive's Review" section, stated that they were:

> sustaining our track record of profitable growth, well placed to take advantage of future opportunities

> Abbey National is in better shape than ever. We have forged ahead with the business in the first half, and have not allowed the corporate uncertainty of recent months to steer us off course.

> We remain one of the most efficient banks in the world.

(Emphasis added.)

91.     In the Bank's SEC Form 6-K dated October 23, 2001 and filed on or about October 30, 2001, it referred to the "sound business mix" of Abbey's Wholesale Bank and reassured the investing public that:

> We believe there will continue to be value-enhancing opportunities through selective acquisition of good quality assets and refinancing opportunities in the current marketing conditions.

(Emphasis added.)

92.     The rosy pronouncements concerning the strong health of Abbey's business; the lack of any "black holes" in the Bank's operations; and the preservation of credit quality contained in the October 23rd press release, conference call and *Evening Standard* article, as well as in the October 26th Form 6-K filing, were false and misleading. They masked the true but undisclosed alarmingly high level of loss exposure that confronted Abbey with its overly risky debt securities portfolio. Defendants hid the existence of this exposure – and even the very identity of which bonds Abbey held – throughout the Class Period by constantly conditioning the investing public to believe that defendants were continuing to maintain tight

control over the credit quality of Abbey's investment portfolio.

93.    Approximately one month later, on or around November 30, 2001, the collapse of Enron – one of Abbey's wholesale banking customers – left Abbey with a potential £180 million loss and caused the Bank to take a £95 million provision for its loans to Enron. The news caused a 5% drop in Abbey's share price. Mark Pain, the new head of Abbey's wholesale banking, told *Bloomberg News* that the Bank's second-half profit would likely be lower than in the year-earlier period, and that full-year profit would likely be "about the same as last year," but failed to disclose that Abbey, despite the explicit private warnings of his predecessor Mr. Jones, had continued to bear an alarmingly high and unsustainable risk exposure in its high yield debt portfolio that portended much greater catastrophe:

> Abbey National Plc said second- half profit may fall as the No. 6 British bank sets aside 95 million pounds ($135 million) to cover possible losses from loans to Enron Corp., the debt-laden U.S. energy trader.

> London-based Abbey National, which is owed 115 million pounds by Enron, joins Dresdner Bank AG, Deutsche Bank AG, National Australia Bank Ltd. and other lenders facing losses from the Houston-based company that has more than $15 billion of debt. Enron had less than $2 billion in cash as of last week.

> Abbey National, the U.K.'s No. 2 mortgage lender after HBOS Plc, said full-year pretax profit, excluding the Enron provision, would surpass last year. Including the loss reserve, profit may be "down" in the second half from the year-earlier period, said Finance Director Mark Pain in an interview.

> Abbey National's pretax profit was 1.98 billion pounds last year, including 1.1 billion pounds in the second half.

> Abbey National's exposure is mainly in bonds that were rated investment grade when they were bought.

Pain further comforted investors by saying that: "Nothing else in our books gives me huge

cause for concern."

94.     In the Bank's SEC Form 6-K dated December 4, 2001 and filed on or about December 17, 2001, concerning its "Enron Exposure and Pre Close Statement," and referencing its Wholesale Bank unit, defendants again reassured the investing public that:

> Excluding the specific provision relating to Enron, profit before tax remains ahead of 2000 levels. Credit quality continues to be monitored closely in light of the uncertain global economic landscape, and we have experienced some limited deterioration.

(Emphasis added.)

95.     In the November 30th *Bloomberg* article and December 17th Form 6-K, Defendants falsely portrayed Abbey's Enron debacle as a self-limiting loss and reassured the investing public that Abbey was closely monitoring credit quality. These statements masked the true but undisclosed alarmingly high level of loss exposure that confronted Abbey with its overly risky debt securities portfolio. Defendants hid the existence of this exposure – and even the very identity of which bonds Abbey held – throughout the Class Period by constantly conditioning the investing public to believe that defendants were continuing to maintain tight control over the credit quality of Abbey's investment portfolio.

**Defendants Remain Silent While Tyco and Worldcom Fall Apart in A Massively Publicized Spectacle**

96.     As alleged herein at ¶¶ 86, 198 and 199, Gareth Jones, the head of Abbey's wholesale banking division had warned defendants about the riskiness of Abbey's investment in private equity debt and high yield debt, and more specifically, in October 2001, Jones had "raised serious concerns about what he estimated to be Abbey's £500 million exposure to Tyco." Despite these specific warnings and in contravention of Defendant Harley's overt promise, on October 23, 2001, that "there

are no black holes and if there were we would have to say so," defendants remained silent as two of Abbey's large holdings, Tyco and Worldcom, crashed and burned at the beginning of 2002.

97.     On January 2, 2002, Tyco's shares fell 3% after a report surfaced in a newsletter published by *SEC Insight Inc.* that the SEC may be investigating Tyco for possible accounting violations, and that the company may not have fully disclosed prior SEC investigations concerning insider trading. In the wake of the Enron collapse, this news was a bombshell to Tyco investors, including Abbey and its shareholders.

98.     By January 7, 2002, Tyco' shares had fallen by 7% erasing $8.7 billion from the company's market value. According to the *Wall Street Journal* Tyco's "sudden stock tumble highlights the market's continuing nervousness about Tyco's accounting." Defendants knew, or should have known, all the public information about Tyco and that investors were punishing Tyco's securities in the wake of these accounting questions. Nevertheless, despite Jones' warnings, and despite Harley's promise to correct his statement that "there are no black holes," defendants remained silent, refusing to correct Abbey's repeated reassuring statements to the market regarding the Bank's wholesale banking investments, and concealed from Abbey's shareholders that Abbey had significant exposure to Tyco.

99.     The market's concerns about Tyco continued to grow throughout January. Barely three weeks into January 2002, Tyco's share price had fallen nearly 25% wiping out $30 billion from its market value. Again, defendants did not correct Abbey's previous reassuring statements, although they knew, or should have known, all the public information about Tyco and that investors were punishing Tyco's securities in the wake of serious accounting questions.

100.     In order to stem the slide in its stock price, Tyco announced a plan to split itself into

four companies on January 23, 2002. According to the break-up plan, Tyco was to conduct initial public offerings for three of its units while attempting to sell its plastics division, the fourth unit. The proceeds from the IPOs would then be used to pay down $11 billion of Tyco's then existing $23 billion in outstanding debt.

101.    In characterizing the split, the *Wall Street Journal* stated: "As the collapse of Enron Corp. triggers widespread investor anxiety about companies with inscrutable finances, giant Tyco International Ltd. – its stock price depressed amid <u>persistent questions about its books</u> – announced a surprise plan to split into four separate companies." (Emphasis added.) The article reported that investors were weary of Tyco's confusing financial disclosures, and remarked that "[t]ransparency was exactly what some investors believed was lacking at Tyco...." Alfred Harrison, manager of the Alliance Premier Growth Fund, discussing Tyco's financial statements was quoted in the article as saying "nobody knows how they put it together, but they do." Harrison compared Tyco to Enron and noted that "to some degree they become faith stocks."

102.    Following news of the proposed break up, Tyco's stock price fell another 5 %, closing at $45.10 a share on January 24, 2002. In an article entitled "Investors Pummel Tyco Stock Following News of Breakup", the *Wall Street Journal* reported that the fall in stock price was remarkable, as usually news of a corporate breakup "tend to add as much as 5 % to a company's stock value in the days following the announcement." Professor Stuart Gilson of Harvard Business School remarked, in the article, that the stock decline suggested that investors <u>fear the company is hiding something</u>, or has not put its controversial accounting issues behind it.

103.    Defendants knew, or should have known, all the public information about Tyco and that investors were punishing Tyco's securities in the wake of these accounting questions. Faced with increasingly bad news regarding Tyco, despite Jones' warnings, and despite Harley's promise to

correct his statement that "there are no black holes," defendants remained silent, refusing to correct Abbey's repeated reassuring statements to the market regarding the Bank's wholesale banking investments, and concealed from Abbey's shareholders that Abbey had significant exposure to Tyco.

104.    On January 29, 2002, it was reported that Tyco paid $20 million to one of its outside directors, Frank Walsh, in return for Walsh's help in brokering Tyco's acquisition of CIT Group Inc. The payment drew criticism from corporate governance experts, as an example of a lack of independence on Tyco's board. For example, Charles Elson, director for Corporate Governance at the University of Delaware remarked to the *Wall Street Journal* that "he never heard of a payment of that size to an outside director, calling it 'highly inappropriate.'"

105.    Additionally, the following day, it was reported that Walsh, at the time of the sale owned, 50,000 shares of CIT stock and, by virtue of Tyco's acquisition, the value of his CIT holdings increased 65%.

106.    Immediately, upon news of the payment, Tyco's stock price dropped 6.7%. The next day, Tyco's down-slide continued, as the company's stock price dropped an additional 20% closing at $33.65, and wiping out an additional $16.7 billion from the company's market value. The trading volume was 168 million shares, the second largest ever, at that time, for a single stock on the NYSE. Defendants knew, or should have known, all the public information about Tyco and that investors were punishing Tyco's securities in the wake of the markets increasing knowledge of Tyco's wrongdoing. While the market fled Tyco, despite Jones' warnings, and despite Harley's promise to correct his statement that "there are no black holes," defendants remained silent, refusing to correct Abbey's repeated reassuring statements to the market regarding the Bank's wholesale banking investments, and concealed from Abbey's shareholders that Abbey had significant exposure to Tyco.

107.     Additionally, Tyco's corporate bonds also traded down sharply following disclosure of the payment to Walsh, from $1.01 for each $1 of bonds outstanding to 95 cents on the dollar. Moreover, the spreadsheet between Tyco's bonds' yield and the interest available from 10-year treasury bonds widened substantially upon news of the payment to 2.45 percentage points over the Treasury bonds from 1.65 the day before. Wider spreads are a sign of greater risk.

108.     In commenting on the fall in Tyco's securities prices, Linda Varoli, an analyst a Merger Insight, told the *Dow Jones News Service* on January 30, 2002 that the payment to Walsh was "a nail in the coffin of Tyco's credibility."

109.     On Thursday, January 31, 2002, *Bloomberg News* published an article entitled "Corporate Bonds Fall on Concerns Over Accounting". The article stated that: "Bonds of Tyco...[and] WorldCom...all tumbled this week. Investors are concerned about accounting practices at Tyco, and expect WorldCom will write off assets when it reports earnings next week." The article further noted that even though Tyco and WorldCom were rated investment grade by Moody's Investor Service at the time, after the collapse of Enron – which was rated investment grade only four days before collapsing into bankruptcy – "investors are more reluctant to take chances."

110.     Jim Shallcross, a portfolio manager with Independent Investment LLC, was quoted in the article as saying: "There is pandemonium and panic in the markets now". (Emphasis added.) He elaborated and stated that among corporate bonds: "There really isn't anything that is cheap and safe...[and that the drop in Tyco bonds] has been enough to make you want to pull all the hair out of your head. It's panic." (Emphasis added.)  Knowing that everyone else was in a "panic" about Tyco bonds and that Abbey had significan exposure to Tyco, despite Jones' warnings, and despite Harley's promise to correct his statement that "there are no black holes," defendants remained silent, refusing to correct Abbey's repeated reassuring statements to the market regarding the Bank's

wholesale banking investments, and concealed from Abbey's shareholders that Abbey had significant exposure to Tyco.

111.    On February 1, 2002, in an article entitled "WorldCom CEO's Loans Come Due As Company's Share Price Implodes", the *Wall Street Journal* documented the perilous state of WorldCom. The article reported that WorldCom's shares fell to their lowest level in almost ten years as "the telecom industry was rocked by fears of an intensifying shakeout."

112.    The article further disclosed the massive loans WorldCom had given to its then CEO Bernard Ebbers. The article disclosed that Ebbers borrowed nearly $85 million from WorldCom in 2000 to cover a margin call for WorldCom stock Ebbers purchased with borrowed money. Additionally, the article disclosed that WorldCom agreed to guarantee a loan of as much as $150 million Ebbers had with Bank of America. Subsequently, On February 7, 2002, Ebbers disclosed that WorldCom had stepped in to cover a loan of $199 million he owed to Bank of America that became due in February 2002 because of the continued drop in WorldCom stock. A *Wall Street Journal* article, published on Februry 8, 2002, described the Ebber's predicament as a "shocking turn of events" and stated that WorldCom's loan coverage was "bold, especially at a time when corporate governance issues are at the forefront of investors minds in the wake of the scandal at Enron []."

113.    On February 3, 2002, the *New York Times* reported that the stock market plunged – specifically mentioning that WorldCom stock "sank sharply" – on concerns that "hidden financial practices like those that felled Enron could effect other companies...." Defendants knew, or should have known, all the public information about Worldcom and that investors were punishing Worldcom's securities in the wake of these revelations. Knowing that the market for Worlcom was in a freefall, particularly after the Enron and Tyco debacles, despite Jones' warnings, and despite Harley's promise to correct his statement that "there are no black holes," defendants remained silent,

refusing to correct Abbey's repeated reassuring statements to the market regarding the Bank's wholesale banking investments, and concealed from Abbey's shareholders that Abbey had significant exposure to Worldcom.

114.    On February 4, 2002, Tyco announced more disturbing news, when it disclosed that it planned to draw down its $5.9 billion back-up credit lines with its banks. The move was caused by the company's fears that is would have difficulty gaining access to the short-term debt market it used to fund its operations. The move was essentially an acknowledgment that Tyco could not sell its commercial paper. This news was even more worrisome in this environment, because inability to sell its own commercial paper was one of the factors that led to the collapse of Enron.

115.    The *Wall Street Journal* reported that "such bank agreements are viewed as emergency backup credit lines...and companies often due what they can to avoid tapping into them." Furthermore, Glenn Reynolds, CEO of CreditSights Inc., was quoted in the article as saying "Investors will smell a hint of panic even if the company itself is not panicking." The article also characterized Tyco as being "at the center of a marketwide maelstrom in which investors are fleeing companies with controversial, or even complex, accounting practices in the wake of the Enron...scandal."

116.    Also on February 4, 2002, as a result of its announcement, Tyco's benchmark bonds suffered a three notch down grade by Standard & Poor's. S&P lowered Tyco's credit rating from single A to triple B, one notch above junk status. S&P also downgraded Tyco's commercial paper.

117.    This should have caused Abbey to specifically evaluate the Bank's exposure to Tyco. A confidential witness who was a senior executive in the Bank's Wholesale division, said that credit downgrades of Abbey's holdings were a significant warning signal to the division. The witness

indicated that a credit downgrade would trigger a re-analysis by the division of the downgraded company.

118.    On news of these disclosures, Tyco's share price dropped an additional 16% closing at $29.90 a share. This further drop brought Tyco's share price down 49% since the start of the new year. Moreover, the market price for Tyco's 6.38% bonds due in 2011 also dropped sharply to 84 cents on the dollar, down from 96 cents. Furthermore, the spread between Tyco's bonds and similar Treasury bonds skyrocketed to 4.5 percent, "a level that is highly unusual for investment-grade bonds []" according to the *Wall Street Journal*. Defendants knew, or should have known, all the public information about Tyco and that investors were punishing Tyco's securities. Though the market would discredit any entity with investments in Tyco or Worldcom, despite Jones' warnings, and despite Harley's promise to correct his statement that "there are no black holes," defendants remained silent, refusing to correct Abbey's repeated reassuring statements to the market regarding the Bank's wholesale banking investments, and concealed from Abbey's shareholders that Abbey had significant exposure to Tyco.

119.    On February 6, 2002, the *Wall Street Journal* reported that WorldCom stock dropped 14% on February 5, 2002 because of concerns that the company would report poor results for fourth quarter of 2001. The article further stated that: "Also battering WorldCom's stock are fears that the company's $28 billion debt level is too high and worry that it will have to take huge write-offs for acquisitions that have lost significant value." (Emphasis added.)

120.    On February 7, 2002, WorldCom announced that its fourth quarter 2001 net income fell 64% and that the company would have to take second quarter 2002 charge of $25-20 billion to write down the value of some acquired companies. During a conference call with investors, Ebbers

denied rumors that WorldCom engaged in any accounting shenanigans. He further stated that there was no likelihood of bankruptcy, credit default, violations of debt covenants, or debt downgrade.

121.    That same day, the *Associated Press* reported that concerns about WorldCom's debt burden, and the fallout from Enron had caused the company's stock plunge thus far for the year.

122.    Also on February 7, 2002, WorldCom disclosed that Ebbers owes WorldCom $340 million to cover loans he took out to buy shares of the company. It was also disclosed that the company extended Ebbers a line of credit of $165 million, $141 million of which had already been drawn down.

123.    On February 9, 2002, the *Financial Times* reported that investors were "jittery about the growing list of companies coming under scrutiny" of their accounting practices. The article further reported that "even the reassurances of top executives from several companies, including WorldCom [and] Tyco, that their accounting problems were exaggerated or false, failed to bolster markets."

124.    On February 19, 2002, Tyco conducted the second of its weekly conference calls, which the company set up in the wake of concerns about its accounting policy. During the call, the company defended its accounting practices, particular its practices related to how the company accounted for acquisitions.

**DEFENDANTS MAKE ADDITIONAL FALSE STATEMENTS IN 2002**

**As Tyco and Worldcom Crumble, Defendants Publicly Reassure Investors That
Abbey Is Not at Risk**

125.    On February 21, 2002, defendant Harley was interviewed by *Bloomberg New's*
Evelyn Brodie about Abbey. In that discussion, Harley stated that the "wholesale bank will continue
to be a growth proposition."

126.    Later in the interview Harley was asked: "You do capture (inaudible). It's 100 million
pounds in those results, because of exposure to Enron. Is that finished now? Is there any more risk?
(Emphasis added.) Harley responded:

> Well, we've done a very thorough review, as you can imagine, of our entire
> wholesale bank portfolio. We've made appropriate, in fact, very conservative,
> we feel, provisions. And, of course, we've been entirely transparent
> throughout the process and we've put our hand up for the exposure that we
> do have. So we're very happy with the present situation. We've dug the drive
> on that. (Emphasis added.)

127.    Also on February 21, 2002, Abbey issued a statement announcing the Bank's
preliminary financial results for full-year 2001. The statement stated in pertinent part: "Despite a
difficult year, the Wholesale Bank remains a sound business. Mark Pain, previously Group Finance
Director, took control of the business in November - and has already implemented measures to
re-focus the business and reduce its risk profile."(Emphasis added.)

128.    The statements made by defendants were false and misleading at the time, because
they omitted to disclose that Abbey faced substantial exposure and risk in its Wholesale division.
Specifically, that the Bank was at risk because of its substantial holdings in Tyco and WorldCom
securities. Indeed, neither Harley or Abbey ever disclosed to investors during the class period that
the Wholesale division even had any investments with Tyco or WorldCom. Thus, as those

companies deteriorated throughout the first half of 2002, Abbey investors were left completely in the dark about the Bank's holdings in those companies.

129.    Defendants knew, or should have known, that Abbey had significant exposure in the debt market, in particular to Tyco and Worldcom. As alleged herein at ¶¶ 86, 198 and 199, Gareth Jones, the former head of Abbey's wholesale banking division had warned defendants about the riskiness of Abbey's investment in private equity debt and high yield debt, and more specifically, in October 2001, Jones had "raised serious concerns about what he estimated to be Abbey's £500 million exposure to Tyco." Moreover, due to Abbey's elaborate risk management structure and internal controls, Harley and other top executives were aware of the true state of the Bank's risk exposure, as alleged below at ¶¶ 233-254. Defendants also knew, or should have known, that Abbey's investments in Tyco or Worldcom were in serious jeopardy and, thus, of material importance to its own investors, because the Tyco and Worldcom frauds were two of the most highly publicized corporate failures in history, only portions of which are specifically alleged herein.

130.    Rather than be forthright with investors, Harley and the Bank instead chose to reassure investors that there was no looming risk, by characterizing the Bank's provisioning as conservative, and by claiming to be entirely transparent with investors. Abbey also assured investors that the risk profile of the bank was being reduced. Moreover, Harley and the Bank "put [their] hand up for the exposure that we do have" and thus conveyed to investors that it had acknowledged already its risk, and that there was no pending risk.

131.    However, defendants should have at least allowed investors to judge the Bank's risk exposure themselves by disclosing that it had Tyco and WorldCom holdings. At the time Harley made these statements, omitting the existence of the Bank's holdings in Tyco and WorldCom, he knew, or was reckless in not knowing, that these companies posed great risk to Abbey because: (1)

Both companies had been accused of accounting wrongdoing and linked to Enron; (2) Tyco's shares price had fallen by about 50% because of the rumors; (3) Tyco's bonds prices had plummeted because of the rumors; (4) The spreads between Tyco's bonds and Treasury bonds were widening; (5) There was massive concern, described as panic and pandemonium, in the bond markets concerning Tyco and WorldCom bonds; (6) Tyco's transparency was openly questioned; (7) Other concerns about Tyco's integrity were raised by, among other things, the disclosure that it paid $20 million to one of its directors to broker an acquisition; (8) Tyco's credit rating for its bonds were cut by S&P to just above junk status; (9) Tyco's commercial paper was unmarketable; (10) Tyco had to tap into emergency credit lines to fund its operations; (11) WorldCom had made questionable and massive loans to its CEO Ebbers, and also guaranteed loans he had with other institutions; (12) WorldCom's stock price was trading at nearly ten year lows; and (13) There was concern that WorldCom's $28 billion debt burden was too high.

**The Situation at Tyco and Worldcom Deteriorates, While Defendants Continue
to Publicly Reassure Investors**

132.    The rumors and negative publicity concerning Tyco and WorldCom continued after Harley's interview with *Bloomberg News*. On March 4, 2002, *Forbes*, in an article entitled "Someone Knew", wrote: "Tyco, the Gap, Ford Motor Credit and Dow Chemical: Are these the next corporate implosions waiting to happen? Maybe not, but a little-known early warning system indicates they are entering dangerous territory. The warning system is an obscure electronic-trading market where banks and other big players buy and sell credit-protection contracts as an insurance policy against loans that might go bad. Lately the price of such contracts is surging, for these companies and others." (Emphasis added.) The article also characterized Tyco as having "shocking accounting problems", and further noted: "Tyco's accounting looks a little iffy and investors are

worried it won't repay its debt. You can see that fear writ numerically in the derivatives market. Protection against default on its 6.375% ten-year bonds has soared to 425 basis points. Correspondingly, the bond's price has fallen, from 98 cents on the dollar in late January to a recent 82 cents."

133.    Moreover, concerning WorldCom, the article revealed that the derivative market for credit-protection contracts "indicates junk status for [WorldCom's] debt" even though the credit rating agencies still rated the company investment grade.

134.    Another article published in the same issue of *Forbes* reported on specific accounting manipulation at WorldCom. The article disclosed that WorldCom cut the book value of MCI's tangible assets that it acquired in 1998 by $3.4 billion and reclassified the sum as goodwill. The article stated that this allowed WorldCom to reduce its depreciation charges, because goodwill could (at that time) be written-off over forty years as opposed to four years for tangible assets. This had the effect of inflating WorldCom's revenue by nearly $700 million, or 10% more than if WorldCom had classified the assets correctly. The article further stated: "One more thing to worry about: WorldCom is goosing its top line with a revenue-swap deal it inked with Electronic Data Systems...whereby each company sold the other $6 billion worth of services."

**Defendants' False and Misleading March 8, 2002 Statement**

135.    On or about March 8, 2002, defendant Abbey made public in England its "Directors' Report and Accounts 2001" ("2001 Directors' Report") and 2001 Annual Review. These documents contained several false and misleading statements that reassured investors that the Wholesale division of the company was not faced with material risk.

136.    Defendant Harley in his Chief Executive Statement in the Annual Review, stated that

the Bank is "re-focusing the Wholesale Bank and <u>reducing its risk profile</u>." (Emphasis added.) Moreover, in the "Chief Executive's Review" found in the 2001 Directors' Report, Harley commenting on the Wholesale division under the heading "Outlook positive," stated: "Risk and financial management will play an increasingly important role in the development of the business, and <u>the risk profile will be reduced</u>." (Emphasis added.) Harley made this statement after discussing how the £95 million provisions for Enron hurt the Bank financially in 2001.

137.    Under the "Operating and Financial Review" portion of the 2001 Directors' Report, in discussing the Wholesale banking division, Abbey stated, under the heading "Increased Emphasis on risk management":

> The business will build on its already sound risk management practices, enhancing the established risk management framework and expertise to deliver leading edge risk management tools, metrics, policies and practices.
>
> The managed portfolio of investments will be re-focused on a well diversified portfolio of higher quality assets, and <u>we do not expect to increase exposures to certain high risk portfolios above the current level</u>.
>
> <u>Good progress has already been made in reducing the risk profile of the Wholesale Bank</u>....

(Emphasis added.)

138.    Also on or about March 8, 2002, in a power point presentation to analysts who follow the Bank, Mark Pain, then the managing director of the Wholesale division, indicated that the Bank was reducing its risk profile through, among other things, "appropriate, conservative provisions".

139.    These statements made by defendants were false and misleading at the time they were made because defendants omitted to disclose that Abbey faced substantial exposure and risk in its Wholesale division. Specifically, that the Bank was at risk because of its substantial holdings in Tyco and WorldCom securities. Indeed, neither Harley or Abbey ever disclosed to investors during the

class period that the Wholesale division even had any investments with Tyco and WorldCom. Thus, as those companies deteriorated throughout the first half of 2002, Abbey investors were left completely in the dark about the Bank's holdings in those companies.

140.    Defendants knew, or should have known, that Abbey had significant exposure in the debt market, in particular to Tyco and Worldcom. As alleged herein at ¶¶ 86, 198 and 199, Gareth Jones, the former head of Abbey's wholesale banking division had warned defendants about the riskiness of Abbey's investment in private equity debt and high yield debt, and more specifically, in October 2001, Jones had "raised serious concerns about what he estimated to be Abbey's £500 million exposure to Tyco." Moreover, due to Abbey's elaborate risk management structure and internal controls, Harley and other top executives were aware of the true state of the Bank's risk exposure, as alleged below at ¶¶ 233-254. Defendants also knew, or should have known, that Abbey's investments in Tyco or Worldcom were in serious jeopardy and, thus, of material importance to its own investors, because the Tyco and Worldcom frauds were two of the most highly publicized corporate failures in history, only portions of which are specifically alleged herein.

141.    Rather than be forthright with investors, Harley and the Bank instead chose to reassure investors that there was no looming risk. Defendants stated that the Bank's risk profile was being reduced, and would be reduced. Moreover, defendants reassured analysts that it had taken appropriate provisions, and was conservative in the amount it had set aside for provisions.

142.    However, the Bank in fact was not reducing its risk exposure. Rather, at the time these statements were made, Abbey was increasingly becoming exposed to greater risk because of its holdings in Tyco and WorldCom. Defendants should have at least allowed investors to judge the Bank's risk exposure themselves by disclosing that it had Tyco and WorldCom holdings. At the time defendants made these statements, omitting the existence of the Bank's holdings in Tyco and

WorldCom, they knew, or were reckless in not knowing, that these companies posed great risk to Abbey as enumerated above. Additionally, since the time Harley gave the interview to *Bloomberg News* on February 21, 2002, it was further revealed that: (1) Credit protections contracts for Tyco had soared, while Tyco's bond prices continued to decline; (2) Similar warning signs that predated Enron's collapse were present with regard to Tyco by March 2002; (3) Perception of Tyco's accounting policies continued to get worse, and was characterized as shocking; (4) The private market viewed WorldCom's bonds as junk; and (5) Specific allegations of accounting improprieties by WorldCom designed to boost the company's revenues were made public by *Forbes* magazine.

143.    On March 11, 2002, more bad news came from WorldCom, as the company announced that it had received a request from the SEC for the production of documents. The company announced that the request asked for, among other things, documents related to accounting policies (including the company's policies relating to accounting for goodwill), the loans it made to Ebbers, and other federal or state investigations of the company.

144.    On March 12, 2002, a *New York Times* article described the SEC's request as an "unusually wide-ranging letter". The article further noted that WorldCom used Arthur Andersen as its outside accountant, the same accountant employed by Enron.

145.    Also on March 12, 2002, the television network CNBC reported on the SEC's investigation of WorldCom. As did the *Wall Street Journal* which stated: "After months of investor questions over accounting practices,...WorldCom...said the Securities and Exchange Commission has launched inquiries into [its] accounting."

146.    On March 13, 2002, the *New York Times* reported that the SEC's investigation was "sweeping" and concerned whether the company "improperly manipulated its financial reports." The article quoted a veteran technology analyst who stated that he "had never seen an SEC request like

this".

147.    On March 15, 2002, the *Wall Street Journal* published an article indicating that WorldCom's loans to Ebbers totaled $341 million, and that such an amount "represents by far the largest amount any company has lent to one of its officers in recent memory." The article further disclosed that the interest rate on Ebber's loan was about 7% to 14% less than the going rate for consumer loans in Jackson, Mississippi, the headquarter's of WorldCom. The previous day, the newspaper had published an article concerning the SEC's inquiry into the loans to Ebber's, and quoted former SEC enforcement official Seth Taube as stating "[a] large loan to a senor executive epitomizes concerns about conflict of interest and breach of fiduciary duty". (Emphasis added.)

**Defendants' False and Misleading March 19, 2002 Statement**

148.    On March 19, 2002, Abbey's 2001 Directors' Report and 2001 Annual Review were filed in the United States with the SEC under Form 6-K. These materials were filed without any corrective disclosure by Abbey concerning the risk exposure faced by the Bank's Wholesale division. Thus, the statements contained therein, and identified above, continued to be false and misleading because defendants failed to disclose the Bank's holdings in WorldCom or Tyco. The false and misleading nature of Abbey's 2001 Directors' Report and 2001 Annual Review is further amplified, because since their release in England on about March 8, 2002, WorldCom became the topic of a widespread SEC investigation.

149.    Defendants' March 19, 2002, Abbey's 2001 Directors' Report and 2001 Annual Review were false and misleading at the time they were made because defendants omitted to disclose that Abbey faced substantial exposure and risk in its Wholesale division. Specifically, that the Bank was at risk because of its substantial holdings in Tyco and WorldCom securities. Indeed, neither Harley or Abbey ever disclosed to investors during the class period that the Wholesale division even

had any investments with Tyco and WorldCom. Thus, as those companies deteriorated throughout the first half of 2002, Abbey investors were left completely in the dark about the Bank's holdings in those companies.

150.    Defendants knew, or should have known, that Abbey had significant exposure in the debt market, in particular to Tyco and Worldcom. As alleged herein at ¶¶ 86, 198 and 199,, Gareth Jones, the former head of Abbey's wholesale banking division had warned defendants about the riskiness of Abbey's investment in private equity debt and high yield debt, and more specifically, in October 2001, Jones had "raised serious concerns about what he estimated to be Abbey's £500 million exposure to Tyco." Moreover, due to Abbey's elaborate risk management structure and internal controls, Harley and other top executives were aware of the true state of the Bank's risk exposure, as alleged below at ¶¶ 233-254. Defendants also knew, or should have known, that Abbey's investments in Tyco or Worldcom were in serious jeopardy and, thus, of material importance to its own investors, because the Tyco and Worldcom frauds were two of the most highly publicized corporate failures in history, only portions of which are specifically alleged herein.

151.    Also on March 19, 2002, more bad news struck Tyco. The *Wall Street Journal*, revealed that Raychem Corp., acquired by Tyco in August 1999, accelerated "certain payments, at Tyco's request, to boost Tyco's cash flow after" the acquisition closed. Moreover, the article disclosed that "critics have said [Tyco] routinely forces companies it acquires to prepay expenses and lower their earnings and cash flow just before they are melded into Tyco...[in order] to flatter Tyco's postacquisition results." Raychem's former assistant treasurer was quoted in the article as saying she was "outraged" by what Tyco asked Raychem to do, adding that Tyco's actions were intended to "deceive". News of Tyco's actions were also reported on the magazine *Fortune's* website.

152.     On March 25, 2002, Abbey filed its Form 20-F annual report with the SEC. The 20-F repeated similar statements made by defendants in the 2001 Directors' Report and 2001 Annual Review. For example, the Form 20-F stated:

> The business will build on its already sound risk management practices, enhancing the established risk management framework and expertise to deliver leading edge risk management tools, metrics, policies and practices.
>
> The managed portfolio of investments will be re-focused on a well diversified portfolio of higher quality assets, and we do not expect to increase exposures to certain high risk portfolios above the current level. 2001 Form 20-F, at p. 11 (Emphasis added.)

153.     The Form 20-F also stated: "The Wholesale bank is being re-focused and its risk (Emphasis added.) profile is being reduced." 2001 Form 20-F, at p. 19. Significantly, defendants filed the 2001 Form 20-F without any corrective disclosure concerning the risk exposure faced by the Bank's Wholesale division.

154.     Defendants' March 19, 2002, Abbey's 2001 Directors' Report and 2001 Annual Review were false and misleading at the time they were made because defendants omitted to disclose that Abbey faced substantial exposure and risk in its Wholesale division. Specifically, that the Bank was at risk because of its substantial holdings in Tyco and WorldCom securities. Indeed, neither Harley or Abbey ever disclosed to investors during the class period that the Wholesale division even had any investments with Tyco and WorldCom. Thus, as those companies deteriorated throughout the first half of 2002, Abbey investors were left completely in the dark about the Bank's holdings in those companies. The false and misleading nature of Abbey's 2001 Form 20-F is further amplified, because since the original release of the statements in England on or about March 8, 2002, two prominent business outlets reported that Tyco intentionally engaged in improper accounting

practices to boost its reported results.

155.    Defendants knew, or should have known, that Abbey had significant exposure in the debt market, in particular to Tyco and Worldcom. As alleged herein at ¶¶ 86, 198 and 199, Gareth Jones, the former head of Abbey's wholesale banking division had warned defendants about the riskiness of Abbey's investment in private equity debt and high yield debt, and more specifically, in October 2001, Jones had "raised serious concerns about what he estimated to be Abbey's £500 million exposure to Tyco." Moreover, due to Abbey's elaborate risk management structure and internal controls, Harley and other top executives were aware of the true state of the Bank's risk exposure, as alleged below at ¶¶ 233-254. Defendants also knew, or should have known, that Abbey's investments in Tyco or Worldcom were in serious jeopardy and, thus, of material importance to its own investors, because the Tyco and Worldcom frauds were two of the most highly publicized corporate failures in history, only portions of which are specifically alleged herein.

156.    On April 3, 2002, WorldCom announced that it planned to lay-off 3,700 workers, about 4% of it then existing workforce. The price of WorldCom Group's shares fell that day 4% down to $6.51, spurred by the news of the lay-offs, and a downgrade by Blake Bath, a Lehman Brothers analyst.

157.    On April 11, 2002, the *Wall Street Journal* published an article entitled "Investors' Spirits Begin to Falter As WorldCom Continues Its Slide". The article stated that WorldCom "continued its downward spiral, as shares of the core WorldCom Group unit fell below $5, their lowest level since 1993." The article cited investors' concerns over the SEC's investigation of the company's accounting as a possible reason for the share price drop. Analyst Bath was quoted as saying "[t]he SEC investigation is making existing holders nervous and keeping new buyers from

stepping in".

158. On April 22, 2002, WorldCom cut, for a second time that year, its revenue and earnings out look for 2002 by slashing at least $1 billion from its projections. Further, analysts suggested that the company's write-downs due to impaired assets would amount to more than $45 billion. WorldCom also refused to comment on whether the SEC probe had evolved yet into a formal inquiry. Also on April 22, 2002, Goldman Sachs downgraded its rating on WorldCom stock to "market perform" from "market outperform."

159. On April 22 and 23, 2002, the three major credit-rating agencies – Moody's Investor Service, Fitch Ratings, and Standard & Poor's – all downgraded WorldCom's debt rating after the company's announcement. Fitch cut its ratings to one notch above junk. Moody's and S&P put WorldCom at two notches above junk.

160. According to analyst John Culver, as reported in the *Wall Street Journal*, "Fitch's downgrade of WorldCom 'reflects Fitch's <u>expectation that the company's revenue and Ebitda will deteriorate during 2002 and that prospects for recovery in 2003 are uncertain</u>". (Emphasis added.) Fitch also stated that the company's rating outlook changed from stable to negative. Moody's further indicated that WorldCom could face more downgrades.

161. The price of WorldCom shares fell 15% to $3.41 on April 23, 2002.

**At Abbey's 2002 Annual Shareholder Meeting, the Bank Yet Again Publicly Reassures Investors That It Is Not at Risk**

162. On April 25, 2002 defendant Abbey held its Annual General Meeting. During the meeting, Abbey stated that: "The business is trading in line with market expectations for the full year 2002."

163. Also on April 25, 2002, *Bloomberg News* reported, under the heading "Corporate

Defaults", that Abbey "doesn't expect bad debts to rise much this year because of 'expectations for a full recovery in the U.K. economy and signs that the U.S. economy is recovering,' Chief Executive Officer Ian Harley said in an interview after today's annual shareholder meeting."

164.    Harley further stated that: "As far as the U.S. goes, we have the same view as the rating agencies, that the first quarter was the worst for corporate defaults,...[and that] [t]he pivot has passed." (Emphasis added.)

165.    That day, Abbey's shares traded in the United Kingdom gained 1.1%, and had gained 12% for the year compared with a 7.6% rise by the FTSE-350 Bank Index. Defendants statements were false and misleading at the time they were made because defendants omitted to disclose that Abbey faced substantial exposure and risk in its Wholesale division. Specifically, that the Bank was at risk because of its substantial holdings in Tyco and WorldCom securities. Indeed, defendants never disclosed to investors during the class period that the Wholesale division even had any investments with Tyco and WorldCom. Thus, as those companies continued to deteriorate throughout the first half of 2002, with dropping bond and share prices and credit downgrades, investors were left completely in the dark that these companies posed a risk to Abbey.

166.    Defendants knew, or should have known, that Abbey had significant exposure in the debt market, in particular to Tyco and Worldcom. As alleged herein at ¶¶ 86, 198 and 199,, Gareth Jones, the former head of Abbey's wholesale banking division had warned defendants about the riskiness of Abbey's investment in private equity debt and high yield debt, and more specifically, in October 2001, Jones had "raised serious concerns about what he estimated to be Abbey's £500 million exposure to Tyco." Moreover, due to Abbey's elaborate risk management structure and internal controls, Harley and other top executives were aware of the true state of the Bank's risk exposure, as alleged below at ¶¶233-254. Defendants also knew, or should have known, that Abbey's

investments in Tyco or Worldcom were in serious jeopardy and, thus, of material importance to its own investors, because the Tyco and Worldcom frauds were two of the most highly publicized corporate failures in history, only portions of which are specifically alleged herein. Rather than be forthright with investors, and disclose the existence of Abbey's holdings in Tyco and WorldCom, defendants instead chose to reassure investors that there was no looming risk. Specifically, Harley, speaking on behalf of the Bank, indicated that he did not expect bad debts to rise that much in 2002, comforting investors with the claim that the first quarter of 2002 was the worst for corporate defaults, and that the worst was done with.

167.    However, defendants should have at least allowed investors to judge the Bank's risk exposure themselves by disclosing, at the very least, that it had Tyco and WorldCom holdings. At the time defendants made these statements, omitting the existence of the Bank's holdings in Tyco and WorldCom, defendants knew, or were reckless in not knowing, that Tyco and WorldCom posed great risks to Abbey as enumerated above. Additionally, the situation of the two companies had deteriorated throughout March and April 2002, including: (1) Employee lay-offs at WorldCom; (2) The continued drop of WorldCom stock to ten-year lows; (3) The reduction in earning estimates for 2002 at WorldCom by at least $1 billion; (4) The downgrade of WorldCom's credit.

**Throughout the Remainder of the Class Period Abbey Never Made Any Corrective Disclosure Concerning the Risk Factors Faced by its Wholesale Division, Even as the <u>Situation at Tyco and Worldcom Continued to Get Worse</u>**

168.    On April 25, 2002, Tyco announced a quarterly loss of $1.9 billion. Additionally, the company announced that it had abandoned its plan to break up the company. Kevin McClosky, a portfolio manager at Federated Investors Inc., told the *Wall Street Journal* at the time that Dennis Kozlowski's (Tyco's then CEO) "credibility is pretty much shot,...[and] there's extreme pessimism about this stock."

169.    Tyco's announcement caused its share price to drop 20% to $20.75, a one-year low. For the year, the stock had lost 65% or $75 billion in market value. The market price of Tyco's 6.38% bonds due in 2011 also fell to 81 cents on the dollar. The *Wall Street Journal* attributed this decline to "investor concern about the debt load and complex accounting practices", as well as fears about the company's liquidity. (Emphasis added.) The article, further stated that Tyco's debt had grown to $27.3 billion, up $2.5 billion from the prior quarter. Later, on April 29, 2002, Tyco's stock price fell an additional 15%, closing at $17 a share, its lowest level since 1997. The stock drop was reported to be caused by its heavy-debt load and strategic flip-flops. A *Wall Street Journal* article quoted Prudential Financial analyst Nicholas Heymann as saying "[e]verybody's been backing up the dump trucks and unloading the stock".

170.    Once more, as Tyco's deterioration continued, and despite Harley's promise to correct defendants' positive and reassuring statements regarding the riskiness of Abbey's Wholesale Bank investment portfolio, defendants continued to fail to correct Abbey's earlier statements and concealed from investors the Bank's significant exposure in debt securities, particularly to Tyco and Worldcom.

171.    On April 30, 2002, it was reported that Ebbers resigned as CEO of WorldCom the day before. According to reports, Ebbers resigned under pressure by the company's outside directors, who were concerned about the SEC's investigation, the dramatic fall in the company's stock price, and the massive loan the company made to Ebbers. In reporting on the story, the *Wall Street Journal* noted that Ebber's replacement, John Sidgmore, faced "the daunting task of restoring confidence in WorldCom at a time when investors are panicking and there has even been speculation that WorldCom might have to file for bankruptcy." (Emphasis added.) The article also noted that the company had $28 billion in debt, and was the seventh largest issuer of corporate bonds.

172.    The price of WorldCom's stock dropped to $2.35 a share on the 29th, and was down

83% since January 2002. Similarly, WorldCom's most "widely quoted bonds" traded at only 48

cents on the dollar on the 29th, according to the *Wall Street Journal*. In characterizing these losses,

the newspaper stated: "The pain felt by bondholders...has been particularly striking. Investors have

suffered $14 billion in paper losses on their investments in the past year, according to traders."

(Emphasis added.)

173.    On April 30, 2002, the first class action alleging securities fraud violations by

WorldCom and its officers and directors was filed in the Southern District of New York.

174.    On May 1, 2002, the *Wall Street Journal* published an article entitled "WorldCom's

Bond Prices Fall Hard, And Corporate-Debt Market Suffers". The article stated:

> In May 2001, when WorldCom sold a record $11.8 billion of bonds, investors
> clamored to get their hands on them. Now, they're scrambling to get out.
>
> In what will likely go down as the worst bond deal in history, WorldCom's
> bonds are now trading at about half their original value, meaning investors
> have lost almost $6 billlion in just under a year -- a stunning decline for
> investment-grade-rated bonds, normally among the safest bets investors can
> make.
>
> While other bond deals have gone bad quickly, never has one as big as the
> WorldCom deal imploded so fast, according to bond analysts. "In terms of
> the amount of loss and the amount of people seeing them, WorldCom
> absolutely blows everything else way," says David Goldman, chief credit
> strategist at Credit Suisse First Boston. "There are deals that have gone
> bankrupt in the first year, but those were tiny deals." (Emphasis added.)

The article further noted that the bond market was effectively treating the bonds as if they were junk,

and that the dramatic drop in price, down to 46 cents on the dollar, suggested that "investors are

predicting a restructuring or even bankruptcy for the company at some point down the line."

175.    Another article in the May 1, 2002 edition of the *Wall Street Journal* stated that

"WorldCom now staggers under $29 billion of bond debt. A host of questions loom about how the company can fix its balance sheet, especially how to pay $3.1 billion in bonds tat come due next year." The article recounted that WorldCom was seeking to extend an unused credit facility it had with J.P. Morgan., but noted "The process may not be easy in the wake of controversial borrowings by debt-heavy Tyco...and Enron...."

176.     The *Wall Street Journal* also reported on how the European financial markets were battering WorldCom, noting that the spread for credit-default swaps on the credit derivative market had widened "amid concern over WorldCom []". Moreover, the article reported that "WorldCom's euro bonds due 2008 now trade near 41% to 43% of face value." As Worldcom's deterioration continued, and despite Harley's promise to correct defendants' positive and reassuring statements regarding the riskiness of Abbey's Wholesale Bank investment portfolio, defendants continued to fail to correct Abbey's earlier statements and concealed from investors the Bank's significant exposure in debt securities, particularly to Tyco and Worldcom.

177.     Also, on May 1, 2002, Tyco outside director John Fort announced that Tyco's board of directors has stepped up it monitoring of Tyco's management in recent weeks, in response to many "issues of concern to shareholders" being present.

178.     On May 9, 2002, WorldCom's debt was downgraded to junk status by Moody's Investor Service and Fitch Ratings. The following day Standard & Poor's also downgraded WorldCom to junk status. S&P downgraded the company based on "significant deterioration in the company's financial condition." It was also noted that the move expressed concerns beyond the near term. As a result, on May 10, 2002, WorldCom's 10-year bonds fell to a trading price of 43 cents on the dollar, and bonds due in 2005 were trading at 54 cents, down from 60 cents. Similarly, WorldCom Group's stock fell 21% closing at $1.58 a share.

179.    On May 14, 2002, Standard & Poor's announced that it was dropping WorldCom from its 500 Index. Nearly 671 million WorldCom shares were traded that day, shattering the record of 34 million Enron shares being traded on November 28, 2001, according to the *St. Petersburg Times*, and driving the price of the stock down to $1.24 a share. The following day, WorldCom announced that it would drawn down $2.7 billion line of bank credit before the credit line expired before June 7, 2002. Previously, the company indicated that it would not have to draw down the credit line.

180.    On May 15, 2002, Tyco filed its Form 10-Q quarterly report with the SEC, and revealed that its debt burden had significantly increased during the quarter ended March 31, 2002. As of March 31, 2002, Tyco had $21 billion of loans and current maturities of long term debt, as compared to only $16 billion as of December 31, 2001. Tyco also reported that it had $5.4 billion outstanding on its credits facility with its banks as of March 31, 2002. The company had no amounts outstanding on its credit facility at the end of December 2001.

181.    On June 3, 2002, Kozlowski resigned as CEO of Tyco. The following day, the Manhattan District Attorney's office indicted Kozlowski for evading over $1 million in New York state and local taxes, arising out of art work purchases by him. By June 7, 2002, the prosecutor's investigation had expanded into a broader one to see if Tyco "repeatedly used its money to buy homes and artwork for several corporate officials without disclosing it to shareholders", according to a report published in the *Wall Street Journal*.

**Abbey Finally Takes Massive Provisions for its Investment Risk That Had Been Present Throughout the Class Period**

182.    On June 10, 2002, Abbey shocked the market when it announced its preliminary financial results for the first half of 2002. The announcement, which came the day before a scheduled

presentation concerning the Bank's Wholesale division, stated that: "Profit before tax for the year is now expected to be substantially lower than current market expectations, and last year. In particular, first half results are expected to show profits significantly below the second half of 2001." Significantly, Abbey also announced massive write-offs and provisioning in its Wholesale banking portfolio for the first six months of 2002, despite having previously reassured investors that the Bank was reducing and would reduce its exposure to corporate risk. The provisions, totaling £256 million, was the same amount the Bank had expected to write down for the entire year 2002. Full-year 2002 provisioning was expected to be £450 million. Abbey's press release stated in pertinent part:

> The weaker result will be driven primarily by additional provisioning and write-offs in the Wholesale Bank. This follows a decision to take a more conservative and anticipatory approach to provisioning in 2002.
>
> The largest part of Wholesale Banking provisioning and write-offs is expected to be taken in the first half, with the total for this period expected to be comparable with the total for the full year 2001. In the second half, levels are expected to fall below the total of the comparable period of 2001. Provisions and write-offs are expected to reduce substantially to more normal levels in 2003.
>
> *   *   *
>
> Wholesale credit markets remain challenging, with increased weakness in some sectors. The new management team in the Wholesale Bank is moving rapidly to reposition the business. We are therefore taking substantial additional provisions and write-offs in 2002 relating mainly to high yield securities, private equity and cable/telecoms exposures. As a result the total amount is now expected to be significantly greater than last year....

183.    Abbeys' announcement further elaborated on these dramatic developments, under a discussion of the financial overview of the Wholesale banking division:

> As part of the repositioning of the Wholesale Bank into a more conservative business mix and growth path, as well as reflecting a continuing hostile credit environment, substantial additional provisioning will be taken in 2002.

*          *          *

The additional substantial provisioning and write-offs in the first six months of 2002 largely relate to exposures to high yield securities and private equity, against an uncertain US economic backdrop. By the interim stage, the level of provisioning, combined with the successful issuance of a collateralised bond obligation, will have significantly reduced the Group's exposure to high yield and capped the potential for future losses from this book. Expected impairments in the private equity portfolio are being provisioned on an anticipatory basis, as well as higher reserves established against various corporate exposures, particularly in the telecoms / cable sectors.

We believe that 2002 will see the peak in terms of provisioning and write-offs in the current cycle, with 2003 returning to a more normal level, but as a result, profits for the year are now expected to be considerably below last year's levels.

184.    The announcement by Abbey was a complete surprise to the market, causing Abbey's ADR and share price to fall. On Friday June 7, 2002, the price for Abbey's ADRs was $29.40 per ADR. On Monday, June 10, 2002, the price of Abbey's ADRs fell to $27.70 per ADR. The price continued to fall each day during the week, closing at $23.80 per ADR on Friday June 14, 2002. Similarly, the price of Abbey's shares traded in England fell from 1007 pence per share on Friday June 7, 2002 to 928 pence per share on June 10, 2002. That day, 48 million shares traded, "almost seven times the daily average of the past six months", according to *Bloomberg News*. For the remainder of the week, the price declined each day, closing at 810 pence per share on June 14, 2002.

185.    The news also shocked the business press and analysts who had previously been kept in the dark along with the investing public. For example, on June 10, 2002, Anthony Hilton, writing for the online version of the *Evening Standard*, in an article entitled "Abbey board must axe the boss", remarked upon news of Abbey's announcement: "So much for Harley's pledge, when it was discovered that the bank was a holder of Enron's bonds, that there were 'no black holes'. He may argue that this is a red hole not a black one – but the City is unlikely to see the joke. The red it wants

to see, unfortunately, is Harley's blood on the carpet."

186.    On June 11, 2002, *The Telegraph* published an article entitled "Investors shocked by Abbey profit warning". The article stated: "Abbey National, the high street bank, yesterday shocked the City when it warned that pre-tax profits for 2002 would be 'substantially lower than current market expectations, and last year'". One Abbey investor was quoted as saying "I am totally bemused. Abbey National recently held a series of investor meetings that I would have described as upbeat. But this is a catalogue of disasters." In an attempt to defend himself against accusations of misleading investors, Harley stated in the article that problems only began emerging after the reassurances defendants provided at the end of April. Harley stated that "sentiment got markedly worse towards the end of last month [May 2002], with the collapse of Tyco, and the US economy has flattened." (Emphasis added.)

187.    Also on June 11, 2002, the *Wall Street Journal* reported that Abbey "is facing pressure to justify its risky lending and investment activities after issuing a surprise profit warning that sent its shares tumbling 8% to their lowest level this year." (Emphasis added.) The newspaper further stated that the "news, coming just two months after the bank said overall trading was in line with expectations, caught investors and analysts totally off guard and led to calls for the resignation of...Harley." (Emphasis added.) The article quoted Fox-Pitt Kelton analyst Mark Thomas as saying the bank has "lost its credibility'". Thomas further stated "[t]here doesn't seem to be a clear rationale to what they are doing," and indicated that further problems could spark a shareholder revolt.

188.    Simon Samuels, Philip Richards, and Nick Lord, analysts at Schroder Salomon Smith Barney, wrote on June 11, 2002 that: "Abbey National has performed badly in the life and pensions market and is now missing its previous cost targets in the Retail Bank. However, the larger shock

was in the Wholesale Bank, where Abbey National has had to more than double expected provisioning and of perhaps greater valuation significance, dramatically raise what most people would view as the ongoing level of 'normal' debts." (Emphasis added.) Similarly, Bear Stearns analysts Mike Trippitt and Nicole Mehalski described Abbey's announcement as "earth-shattering".

189.    Morgan Stanley analysts Robin Down, Peter Toeman, and William de Winton, in discussing Abbey's provisioning, wrote on June 11, 2002 that: "[I]t's only natural to be cautious given the magnitude of losses that have emerged from an operation which, until relatively recently, was perceived to be almost risk free." (Emphasis added.) The analysts further stated that Abbey is "signaling a higher level of risk in the wholesale bank than appeared evident before the recent debacle." (Emphasis added.)

190.    Michael Helsby and Simon Willis, analysts at ING Financial Markets, wrote on June 13, 2002 "that the key issue affecting the Abbey National valuation is credibility." Demonstrating the lack of adequate risk disclosure concerning Abbey, the analysts remarked that "[p]reviously, the Wholesale Banking losses have been an unknown quantity...we believe that the arrival of the new financial director [Stephen Hester who became the Bank's finance director on April 25, 2002] has marked a turning point in Abbey National's ability to manage market expectations and follow a prudent provisioning policy."

191.    That same day, Abbey's credit rating was cut by Standard & Poor's from AA to AA-. According to *Bloomberg News*, the Bank had maintained its AA credit rating since at least 1995.

192.    On June 14, 2002, the *Wall Street Journal* published an article entitled "Abbey National Chief Harley Is at Heart of Bank's Problem". The article began: "If Ian Harley's tenure at the helm of Abbey National has been characterized by one thing, it has been the making and breaking

of rash promises." The article continued that "Over-promising has been the heart of Abbey's problems."

193.    On June 16, 2002, *The Observer* published an article entitled "Abbey's habit of getting it wrong". The article opened: "Ian Harley...jokes that he has the same press agent as Osama bin Laden. That, he says, is why investors were last week calling for his head - it had nothing to do with the small matter of <u>his habit of springing nasty surprises, such as the shock announcement of 'substantial' extra provisions in wholesale banking</u>." (Emphasis added.)

194.    Also on June 16, 2002, *Scotland on Sunday* published an article entitled "Abbey's dodgy habit". The article stated: "Ian Harley...has spent the past few days attempting to explain to shareholders how the bank could be trading in line with expectations as recently as April only to announce, all of a sudden, a profits warning last Monday. As if life isn't complicated enough."

195.    *This is Money.co.uk* also reported on June 16, 2002 that: "Pressure on Harley has been growing since Monday, when Abbey <u>shocked the City</u> by warning that profits would be 'substantially lower' than expected because of losses on junk bonds and private equity investments. The announcement came eight months after Harley insisted there were 'no black holes' in the wholesale banking division when its head Gareth Jones quit abruptly." (Emphasis added.)

196.    Scotland's *Sunday Herald* further reported on Abbey's shock announcement in the June 16, 2002 edition of its newspaper. The article stated: "Abbey started looking increasingly vulnerable after its <u>shock warning</u> prompted institutions to openly question the abilities of chief executive Ian Harley." (Emphasis added.) The article continued: "The main accusation is that <u>Harley misled investors</u> by talking up the mortgage bank's prospects just weeks before issuing a warning that it will have to write off losses of £400 million in its wholesale banking division."

---

197.    On Tuesday, June 18, 2002, analysts at Bernstein Research Call indicated, under the heading "risks", that "management has lost a lot of credibility." These same sentiments were expressed in an article published on June 23, 2002, by the British *Sunday Times*, which stated: "The City has lost faith in Harley's word." (Emphasis added.) The article further stated that: "The past year has been a bad one for [Harley] and the last couple of weeks have been even worse. He assured the market everything was running to plan at Abbey National, only to have to eat his words weeks later when he issued a profit warning."

**Following Abbey's Massive Provisioning, and the Revelation of the Bank's Holdings in Tyco and WorldCom, Harley Faces Denouement and is Forced out as Abbey's CEO**

198.    On, June 15, 2002, Gareth Jones wrote an open letter to Abbey Chairman Lord Burns that was widely reported in the business press. Concerning the devastating effect Abbey's debt holdings had on the Bank, Jones stated: "I voiced my worries about this from the outset, arguing that the returns on private equity debt would be too erratic and that a move into high yield debt would incur bad debts." Jones also stated that during his tenure, he was persistently pressured by Abbey's board into making high-risk investments, in the hope they would generate high returns. Jones recounted that as early as 1997, he was put under increasing pressure to invest in junk bonds and that the board ignored his warnings that they were risky. When Abbey's board overruled his objections, Jones resigned.

199.    Jones also opined in his letter that Tyco "is principally responsible for the additional provision announced last Monday". Jones said at the time of his departure in October 2001, he raised serious concerns about Abbey's exposure to bonds issued by Tyco. Jones estimated that Abbey had about £500 million of exposure to Tyco bonds, at the time he left the bank. Jones stated in his letter "My exact words to Mark Pain [Jones successor as head of the Wholesale division] were 'whatever

you do, take out some credit protection'. In light of subsequent events it appears my advice was ignored." *The Telegraph* reported on June 16, 2002 that Jones's claim "is the <u>first time</u> the extent of Abbey's exposure to Tyco has been revealed." (Emphasis added.) The following day, June 17, 2002, Abbey, as reported by *Bloomberg News*, claimed that, as of that date, it held £60 million of Tyco bonds.

200.    On June 26, 2002, Abbey's holdings in WorldCom first became public, when *Bloomberg News* reported that Abbey held about £20 million of WorldCom bonds, according to "a person familiar with the matter". That same day, shares of the bank fell 4.3 % to 737 pence, and wiped out about £600 million of Abbey's market value. On June 27, 2002, Abbey vaguely stated that it had no "material exposure to WorldCom". On July 2, 2002, *Bloomberg News* reported that collateralized debt obligations managed by Abbey had holdings in WorldCom; as a result Fitch, Inc. had put the collateralized debt obligations of Abbey on the "watch for downgrade". Collateralized debt obligations are bundles of bonds or other assets that are parceled together and sold as new securities. In May 2002, Abbey sold a collateralized bond obligation called Newark that reportedly contained the bulk of the Bank's junk bonds. However, Abbey retained around $100 million of risk through a junior note.

201.    On July 19, 2002, Harley resigned as Abbey's CEO under intense pressure from investors. The next day, the *Financial Times* indicated that a major factor causing Harley's resignation was the provisions the Wholesale Bank took on June 10, 2002, which were "far more than analysts had expected [and that]...[i]nvestor unhappiness with poor share performance was exacerbated by the profits warning coming only six weeks after Mr. Harley said the bank was in line with expectations."

---

202.    The *Guardian* reported on the 20th that: "[Harley's] departure was hastened by his old colleague, Mr. Jones, who took it upon himself to send Mr. Harley an open letter denying that he had anything to do with the growing bad debt problem and revealing, along the way, that Abbey had a big exposure to Tyco, another American corporate disaster which was busy imploding at the time. The City was appalled, and Mr. Harley's days have been numbered ever since." The *Guardian* also cited as a contributing factor that Harley "was forced to eat his words" after assuring investors in October 2001 that there were no "black holes" in the Wholesale division's portfolio.

203.    *Bloomberg News*, first reporting the story on July 19, 2002, characterized Harley as having been fired because "his investments in telecommunications companies, junk bonds and private equity markets wracked up losses of 256 million pounds in the first half [of 2002]. The investments included loans to Enron....It also included bonds sold by WorldCom...." Later, on July 26, 2002, the Bank admitted that its holdings in WorldCom contributed to the provision taken by the Wholesale division, when it announced its intent to issue bonds of its own. As reported by *Bloomberg News*: "Abbey said it plans to scale back its corporate lending after losing money on loans to Enron...and investments in bonds sold by WorldCom...."

204.    Six days later, on July 25, 2002, a company spokesman told *ERisk* that "perhaps our investors hadn't been entirely clear on what wholesale banking involved. If Abbey is linked to Enron and Worldcom, it's no wonder investors who thought we were solely a mortgage bank would get upset."

**Following the Ouster of Harley After the Close of the Class Period, Abbey Tacitly Admits That its Previous Disclosures Representing That its Provisioning Was Conservative and Transparent Did Not Reveal to Investors the True Risks Faced by the Bank**

205.    On or about July 24, 2002, Abbey released its results for the first six months of 2002.

Abbey announced that its provisions for the Wholesale division were £272, and provisioning for the Bank as a whole was £378 million. In a power-point presentation accompanying the release, Lord Burns and Stephen Hester provided an overview of the fiscal health of the Bank and its various divisions. Remarkably, during the presentation, the Bank effectively admitted that its previous disclosures were inadequate to apprize investors of the risk exposure of the Bank, when it revealed that one of its "financial objectives" going forward was to "improve transparency, reduce risk of 'surprises'". (Emphasis added.) The presentation further revealed that a "strategic focus" of the Wholesale division in the future, was to take a "more conservative stance on provisioning."

206.    The actual half year report, entitled "2002 Interim Financial Results" in an SEC Form 6-K dated July 31, 2002 and filed on or about July 31, 2002, further elaborated on the insufficiency of previous provisioning and Abbey's plans to improve the risk exposure of the Bank in the future. For example, the report stated "Whilst we regard the Wholesale Bank as an essential part of any financial services group of our size, the recently completed strategic review has highlighted the need to significantly change the remit of this business going forward. In particular the business is [among other things]: moving towards a more conservative provisioning stance...." (Emphasis added.) Abbey also indicated that one of its goals was to cap its exposure to junk securities, private equity, and take a "more conservative stance on other risk concentrations."

207.    On November 27, 2002, Abbey gave a 2002 Full Year Pre-close Statement, and acknowledged that its previous disclosures did not reveal the true risk exposure the Bank had. For example, Abbey's announcement states: "The Group [i.e. Abbey] will also continue the practice adopted at its half-year results of increasing transparency of its financial reporting enabling clear external assessment of business performance as well as exposures still carried by the Group."

(Emphasis added.)

208.     The announcement also states: "Abbey...is in the middle of a wide-ranging and intense strategic review, covering business, financial and risk aspects of its activities. An immediate goal of this review is to establish a robust risk management and control framework, within which management will move as rapidly as markets permit to align exposures more closely to the Group's risk tolerance whilst avoiding unnecessary value destruction. <u>Provisioning together with enhanced disclosure will provide a strong and on-going level of transparency</u>." (Emphasis added.)

209.     Analysts covering the stock likewise acknowledged that Abbey's June 10, 2002 announcement was a result of Abbey honestly re-evaluating its actual risks, not, as was stated by Harley on June 11, 2002, any surprising developments since the company gushed ebulliently about the Bank at the end of April 2002.

210.     For example, Morgan Stanley analysts Down, Toeman, and de Winton remarked on June 11, 2002 that: "With a new finance director [Stephen Hester] entering the business...<u>there was always a chance the numbers for '02 would be 'cleaned up'</u>". (Emphasis added.)

211.     Similarly, ING analysts Helsby and Willis noted on June 13, 2002 that the strategic review of the Wholesale division, a presentation held by the Bank on June 11, 2002, "'<u>lifted the mist</u>' on the division's earnings outlook and to a degree the volatility of its earnings." (Emphasis added.) The analysts had previously intimated that Hester's appointment as Abbey's new finance director was a "turning point" away from the division's losses having previously been an "unknown quantity." The analysts also stated that the "meaningful provisions" taken by the Bank, and "change in stance should protect against future shocks."

212.     In this same vein, Bear Stearns analysts Trippitt and Mehalski remarked on June 10,

2002 that: "The additional Wholesale Bank provisioning has arguably been driven by a change in outlook (and we assume the appointment of a new CFO has acted as a catalyst) more than a change in current operating conditions. Stephen Hester, newly appointed Finance Director, has taken a fresh view of Wholesale Banking provisions and it is incumbent upon him to share with the market as far as possible these underlying assumptions." Likewise, analysts Samuels, Richards, and Lord, at Schroder Salomon Smith Barney, noted on June 11, 2002 that Abbey's provisioning reflected "a more prudent approach to provisioning" taken by Hester. (Emphasis added.)

## GAAP ALLEGATIONS

**Defendants' False and Misleading Statements In And Omissions From Its SEC Filings Violated GAAP And Various SEC Disclosure Regulations**

213.    Defendants' failure to timely disclose the impairment of Abbey's high-yield bond holdings during the Class Period violated Generally Accepted Accounting Principles ("GAAP"). Specifically, as alleged above, on both March 19, 2002, and March 25, 2002, defendants filed periodic reports with the SEC (on Forms 6-K and 20-F, respectively) containing Abbey's financial statements for fiscal 2001. As a result of the stunning revelations alleged above, by late March 2002, holders of both Tyco and WorldCom debt and equities had seen the value of their investments plummet since the start of the year.  According to GAAP, significant events which occur subsequent to the last day of the period reported (here, December 31, 2001) but before the date the financial statements are filed (here, March 19 and 25) cannot simply be ignored.  Depending upon whether a subsequent event indicates conditions which existed prior to or subsequent to the last day of the reporting period, losses need to be included in the results of operations or, at the very least, in a footnote disclosure.  Abbey did neither.

214.    These omissions were particularly significant because, as a foreign filer, Abbey was

not required to file a Form 10-Q, covering the first quarter of 2002.  No periodic financial filings for 2002 were made until July 24th.

215.    As set forth in the Financial Accounting Standards Board's Statement of Concepts ("CON") No. 1, one of the fundamental objectives of financial reporting is for it to provide accurate and reliable information concerning an entity's financial performance during the period being represented. CON 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use the information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect an investors' and creditors' expectation about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

216.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading and inaccurate." 17 C.F.R. §210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted in the AICPA's professional standards:

> financial statements are management's responsibility . . . [M]]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transaction and the related assets, liabilities and equity are within direct knowledge and control of management . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

217.    Defendants failed in their responsibilities and materially misled investors, because Abbey's improper accounting violated the fundamental GAAP principle that financial statements

must give an accurate representation of a company's finances.   Moreover, defendants violated several specific rules of GAAP reporting with respect to valuing assets.

218.   Statement of Financial Accounting Standards ("FAS") No. 115, entitled "Accounting for Certain Investments in Debt and Equity Securities," applies to equity securities that have readily determinable fair values and for all investments in debt securities.   FAS 115 provides that when a financial statement is issued, with respect to securities classified as either available-for-sale or held-to-maturity, an enterprise must determine whether a decline in fair value below the amortized cost basis is other-than-temporary. If the decline in fair value is judged to be other-than-temporary, the cost basis of the individual security is written down to fair value as a new cost basis and the amount of the write-down is included in earnings. The new cost basis established is not to be changed for subsequent recoveries in fair value.

219.   Paragraph 16 of Statement 115 provides that a debt security should be considered to be impaired when a company determines that "it is probable that an investor will be unable to collect all amounts due according to the contractual terms [*e.g.*, both principal and interest terms] of a debt security."   Once impairment is deemed to occur, the cost basis of the security "shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss)."

220.   SEC Staff Accounting Bulletin ("SAB") Topic 5-M ("Other Than Temporary Impairment of Certain Investments in Debt and Equity Securities") provides the following guidance for reporting companies engaged in this analysis:

> The value of investments in marketable securities classified as either available-for-sale or held-to-maturity may decline for various reasons. The market price may be affected by general market conditions which reflect prospects for the economy as a whole or by specific information pertaining

to an industry or an individual company. Such declines require further investigation by management. Acting upon the premise that a write-down may be required, management should consider all available evidence to evaluate the realizable value of its investment.

There are numerous factors to be considered in such an evaluation and their relative significance will vary from case to case. The staff believes that the following are only a few examples of the factors which, individually or in combination, indicate that a decline is other than temporary and that a write-down of the carrying value is required.

221.   These factors include:

    1.      The length of the time and the extent to which the market value has

            been less than cost;

    2.      The financial condition and near-term prospects of the issuer, including any

            specific events which may influence the operations of the issuer such as

            changes in technology that may impair the earnings potential of the

            investment or the discontinuance of a segment of the business that may affect

            the future earnings potential; or

    3.      The intent and ability of the holder to retain its investment in the

            issuer for a period of time sufficient to allow for any anticipated

            recovery in market value.

222.   SAB Topic 5-M summarizes that:

Unless evidence exists to support a realizable value equal to or greater than the carrying value of the investment, a write-down to fair value accounted for as a realized loss should be recorded. In accordance with the guidance of paragraph 16 of Statement 115, such loss should be recognized in the determination of net income of the period in which it occurs and the written down value of the investment in the company becomes the new cost basis of the investment.

---

223.    Thus, defendants' failure to either engage in the requisite investigation and analysis, or to timely disclose the results of such investigation and analysis, when confronted with the substantial erosion in the value of Abbey's high yield bond portfolio – in particular its holdings in Tyco and Worldcom – violated GAAP.  Among the factors that should have precipitated action by defendants were, as above alleged in detail: the lengthy erosion period of time and magnitude of the impairment in the value of these bonds, the dire financial condition and near-term prospects of the issuers of the bonds, and the low likelihood of these bonds achieving an anticipated recovery in their market value.

224.    Moreover, defendants' failure to disclose impairments of Abbey's investments in its high-yield bond portfolio violated Abbey's own published accounting policies.  Thus, Abbey's SEC Form 20-F filing of March 25, 2002 (covering reporting year 2001) stated, in a section entitled "**Critical** Accounting Policies and Practices,"  that:

> The following estimates and judgements are considered important to the portrayal of the Group's financial condition.
>
> ***
>
> (b)    Securities
>
> Debt securities, equity shares and similar interests held for investment purposes are stated at cost, adjusted for amortization of premium or discount on an appropriate basis. Provision is made for any impairment. T**he Group conducts regular impairment reviews of the investment portfolio and considers indicators, such as serious downgrades in credit ratings**, breach of convenants or failure to make interest payments, that may suggest that interest and principal may not be paid in full.

(Emphasis added.)

225.    In addition, SEC Staff Accounting Bulletin No. 59 ("SAB 59"), *Accounting for Noncurrent Marketable Equity Securities* specifies that declines in the value of investments in marketable securities caused by general market conditions or by specific information pertaining to

an industry or an individual company, "require further investigation by management." In this regard, SAB 59 states: "[a]cting upon the premise that a write-down may be required, management should consider all available evidence to evaluate the realizable value of its investment." Therefore, in conducting its investigation, management should consider the possibility that each decline may be other than temporary and reach its determination only after consideration of all available evidence relating to the realizable value of the security.

226.    SAB 59 states that the "other than temporary" standard does not mean "permanent" impairment. Thus, the point at which management deems the decline to no longer be temporary triggers the obligation to write-down the investment. Logically, this point may well precede any determination that an investment is permanently impaired.

227.    The determination that an impairment is "other than temporary" should be based on subjective as well as objective factors, including knowledge and experience about past and current events and assumptions about future events. The following are examples of such factors and, as detailed above, many, if not all, of them applied to Abbey's high-yield bond holdings:

(a)    Fair value is significantly below the cost and the decline is attributable to adverse conditions specifically related to the security or to specific conditions in an industry or in a geographic area;

(b)    The security has been downgraded by a rating agency;

(c)    The financial condition of the issuer has deteriorated;

(d)    Scheduled interest payments have not been made; and

(e)    The entity recorded losses from the security subsequent to the end of the reporting period.

228.    Despite the cascade of negative events in the high-yield bond market during the class period, particularly the catastrophic losses which befell Tyco and WorldCom, defendants improperly failed disclose that substantial provisions would be taken in 2002 as a result of such impairment. Thus, defendants violated GAAP, which requires that the company shall determine whether a decline in fair value of the securities in its investment portfolio to below amortized cost is "other than temporary." It is impermissible for a company to not to disclose that an investment is impaired when, as of the date of the financial reporting, its was not likely that the investment would pay out at maturity. CON 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, provides that "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . ."

229.    All of the above GAAP provisions clearly demonstrate that Abbey would have to make a provision for loss impairment in its financial reporting for 2002. That being the case, GAAP also required that disclosure of an estimate of such loss. Specifically, FAS 5, *Accounting for Contingencies*, provides, at ¶11:

> After the date of an enterprises financial statements but before those financial statements are issued, information may become available indicated that an asset was impaired or a liability was incurred after the date of the financial statements or that there is at least a reasonable possibility that an asset was impaired or that a liability was incurred after that date . . . [T]he information may relate to a loss contingency that did not exist at the date of the financial statements . . . [To prevent the financial statements from being misleading,] the financial statements shall indicate the nature of the loss or loss contingency and give an estimate of the amount of range or loss or possible loss or state that such an estimate cannot be made.

230.    Thus, defendants violated GAAP by failing to specifically detail the probabilities of loss occasioned by the highly publicized and dramatic series of events impacting on the value of its high-yield investment portfolio when Abbey filed its Form 6-k and Form 20-F in late March 2002.

231.   As detailed above, these public filings presented a false impression of the financial health of the Bank.  Because of these accounting improprieties, defendants also violated the following litany of fundamental GAAP provisions:

a.   The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

b.   The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probably that the judgement of the reasonable person relying upon the report would have been changed or influence by inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶ 132);

c.   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (FASB Statement of Concepts No. 1, ¶ 50);

d.   The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors

often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1, ¶ 42);

e.     The principle that financial reporting should be reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting. (FASB Statement of Concepts No. 2, ¶¶ 58-59);

f.     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2, ¶ 80);

g.     The principle that conservatism be used as a prudent reaction to uncertainty to try to unsure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶ 95, 97); and

h.     The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies. (SFAS No. 5, *Accounting for Contingencies*).

232.     These failures also rendered the Bank's class period financial statements and SEC

filings materially false and misleading.

## ADDITIONAL SCIENTER ALLEGATIONS

**Abbey's Elaborate Risk Management Structure Ensured That Harley and Other Top Executives Were Aware of the True State of the Bank's Risk Exposure**

233.    As alleged herein, defendants acted with scienter in that defendants knew or were reckless in not knowing that the public documents and statements issued or disseminated in the name of the Bank were materially false and misleading; knew or were reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly participated or acquiesced substantially in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Abbey National, their control over, and/or receipt and/or modification of Abbey National's allegedly materially misleading misstatements and/or their associations with the Bank which made them privy to confidential proprietary information concerning Abbey National, participated in the fraudulent scheme alleged herein.

234.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Abbey National securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Bank, its business, operations and prospects, as alleged herein.

235.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Abbey National's business, operations and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Abbey National and its business, prospects and operations, thus causing the Bank's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Bank's securities at artificially inflated prices, thus causing the damages complained of herein.

236.     In Abbey's 2001 Directors' Report, and in its Form 20-F for the year, the Bank boasts about its risk management structure, which it described in great detail in these documents. This served to reassure investors that Abbey was vigilant against risk and that the likelihood of any unforseen risks harming the Bank was *nil*. Additionally, Abbey's elaborate structure also demonstrates that the Banks' directors, and top executives, including Harley, were aware of the specific risks faced by the Bank.

237.     In its 2001 Directors' Report, the Bank states: "Abbey has a well developed structure for managing risk, which consists of a comprehensive set of committees." According to the Report, the principal risk committee is the Group Risk Committee ("Risk Committee"), which is responsible for monitoring the level of risk on the Bank's balance sheet. The Risk Committee is subordinate only to Abbey's Board. The Report states that the Risk Committee "meets monthly, chaired by the Chief Executive, and its membership comprises all his direct reports plus one executive manager." (Emphasis added.)

238.     Subordinate to the Risk Committee are a series of other committees that focused on

particular types of risk. For example, the Group Market Risk Committee ("Market Risk Committee") "monitors and reviews market risk exposures and approves market risk policies and standards". The 2001 Directors' Report states that the Market Risk Committee includes "two executive directors in its membership", and meets monthly.

239.    Another sub-committee, the Group Credit Committee ("Credit Committee") "monitors and reviews credit risk exposures and approves [Bank] credit policies". This committee, according to the 2001 Directors' Report, comprises three members from [the Risk Committee] plus several members of the Executive Management Group, including business area risk specialists, and meets monthly...."

240.    The 2001 Directors' Report further states that: "The Board, at its regular monthly meetings, reviews in detail the minutes of [the Risk Committee], which incorporate key points from the minutes of [the Credit Committee]...and [the Market Risk Committee]." The Report continues: "One of the responsibilities of the Chairman is to ensure that Board members receive sufficient and timely information regarding corporate and business issues to enable them to discharge their duties."

241.    Along these lines, the Report also states that: "There are further risk committees in each major business area which report into the Group committees [e.g. the Credit Committee]. Specialist risk managers within each business have responsibility for the management and control of the risks generated within that business. Rick control responsibilities are undertaken independently of the business, reporting to the Group Risk Director. A Group Risk function ensures that policies and mandates are established for the Group [i.e. Abbey] as a whole, monitors and reports exposures to the Board, and sets standards for risk management." (Emphasis added.)

242.    Discussing the credit risk in the Wholesale division, the 2001 Directors' Report states: "With respect to asset quality in Wholesale Banking, a clear set of credit mandates and

policies has been established by [the Risk Committee]....All transactions falling within these mandates and policies are scrutinized by the appropriate treasury credit committee. Specific approval is required for all transactions which fall outside these mandates. Abbey National Financial Products (ANFP) operates within Wholesale Banking's overall mandates. The controls over, and risk assumed by, ANFP are closely monitored and tight risk control limits are consistently applied. Analyses of credit exposures and credit risk trends are provided in summary for the ANTS Board each month, and more detailed reports are provided to [the Credit Committee] on a regular basis. Large exposures (as defined by the FSA) are reported monthly internally and quarterly to [the Risk Committee] and the FSA." (Emphasis added.)

243.    According to Abbey's Form 20-F, as of March 8, 2002, the directors on the ANTS Board included, among others, Ian Harley and Mark Pain. Harley was identified as the Chairman of the ANTS Board, and Pain was identified as the Chief Executive of the ANTS Board.

244.    Concerning market risk, the 2001 Directors' Report states: "[the Market Risk Committee] has been established to ensure that the Group has an appropriate framework in place to manage market risks, by reviewing and approving high level policies and related controls, encouraging a best practice approach. Business area policies, limits and mandates are established within the context of the Group policy and monitored by business area market risk committees with Group Risk monitoring the consolidated short-term market risks daily and [the Market Risk Committee], [the Risk Committee] and the Board reviewing the consolidated position at least monthly. (Emphasis added.)

245.    The 2001 Directors' Report further states: "Senior management receive regular consolidated market risk reports covering the range of risks generated by the Group...."

246.    Concerning market risk in the Wholesale banking division specifically, the 2001

Directors' Report states: "The Wholesale Banking Market Risk Mandate, approved by both ANTS Board and [the Market Risk Committee], specifies the maximum level of market risk that may be taken. This is subject to an annual review. The level of risk is monitored against the Wholesale Banking Market Risk Mandate and <u>reported daily to the ANTS executive directors</u>. ANTS consistently operates within the approved limits. Risk exposures are calculated on individual portfolios with limits placed on the overall level of risk in each portfolio, or limits placed on the individual risk types within the portfolio." (Emphasis added.)

247.    The 2001 Directors' Report further elaborates on the Board's involvement with the analysis of the Bank's risk. Under the heading "Corporate Governance", the Report states: "The Board confirms that an on-going process for identifying, evaluating and managing the Group's significant risks has operated throughout the year and up to the date of approval of the Directors' Report and Accounts. This process has been subject to regular review by the Board...."

248.    The Report continued: "The Board has established a process for reviewing the effectiveness of the system of internal control through reports it, and the board committees, receive from the executive risk committees and various independent monitoring functions. The Audit Committee...makes an important contribution to this assurance process. Internal Audit provides independent and objective assurance that the processes by which significant risks are identified, assessed and managed are appropriate and effectively applied." Following this discussion, the Report assured investors that Abbey's losses associated with Enron "was not the result of a control failure."

**A Former Senior Insider Confirms that Defendants Were Thoroughly Aware of Abbey's Inordinately High Investment Risk Exposure Yet Brazenly Lied About it To the Public**

249.    A confidential witness, who was a senior executive in the Wholesale division at relevant times, provided further evidence of defendants' scienter. The witness has firsthand

knowledge of many of the allegations set forth herein, as he, along with Harley and others, attended executive meetings during which the company's risk exposure was often "discussed in great detail." Specifically, the witness recalls attending many Board meetings and "special risk committee" meetings with Harley. The witness indicated that approximately twelve to sixteen individuals were present during these regular meetings.

250.    The witness indicated that, generally, Harley was aware of everything that was going on in the division, and that Harley and other executives had plenty of warning about the Bank's risk. The witness indicated that a "Group Risk Function", a distinct unit in the Bank, was responsible for alerting Harley to issues of risk, and in fact did so. The witness indicated that risk factors were discussed in detail when the ANTS Board met, and that Harley was the chairman of that Board. The witness also stated that if Harley was not present at a meeting, he was provided with minutes of those meetings. The witness further indicated that internal memos concerning risk were produced and circulated.

251.    The witness also said that upon becoming CEO, Harley wanted the division to take on more risk, to try to generate higher returns for the unit. The witness stated that Harley was specifically made aware that a strategy in pursuit of higher yields had greater risks associated with it than other strategies.

252.    The witness provided some insight into the risk analysis of the division. The witness indicated that before the division invested in a company, the they would undertake a "thorough credit appraisal." The witness also indicated that a credit downgrade would trigger a re-analysis of the company. Furthermore, the witness stated that falling stock price was also a risk factor monitored by the division.

253.    The witness said that the division was aware of the risk factors associated with Enron

and Tyco in 2001, and before those companies collapsed. The witness stated that Abbey acquired Enron securities only a few months before the company's downfall. However, the witness said that the dropping stock price of the company, throughout 2001, and after Abbey acquired its holdings, was a warning signal. The witness also indicated that the resignation of Jeffrey Skilling, Enron's former CEO and president (which occurred on August 14, 2001) was also a warning signal. Regarding Tyco, the witness indicated that the division had already had concerns about that company's CEO, Dennis Kozlowski, in 2001. The witness felt that Abbey should not have maintained its large exposure to Tyco by that time.

254.    The witness also opined that the division should have been extra careful in the face of a deteriorating global economy. The witness indicated that these concerns were fully discussed during the executive meetings.

255.    As backdrop, the witness explained that the eroding life insurance portion of Abbey's business put the Bank under tremendous financial strain. The witness indicated that the capital availability of the insurance unit was dependent on the equity markets in both the U.K. and the United States. In fact, the witness characterized the unit as being over-invested in equities. As a result, according to the witness, as the markets began to suffer during 2001 and 2002, insurance regulators forced the Bank to provide funding to the insurance unit in order to meet minimum capital requirements. According to the witness, Abbey had to "scramble to make profits" in order to facilitate this infusion of capital to its insurance unit. The witness said that Abbey's executives all knew what was happening in the equity markets, and how it would effect the insurance unit.

256.    When asked about Abbey's statements to the public concerning the Bank, the witness recalled that at Abbey's 2002 Annual General Meeting, the Bank assured investors to the effect that "everything is rosy in the garden." The witness found those reassurances to be "incredible" in light

of the actual risks the Bank then carried. The witness summarized that the company had carried out an inordinately risky investment strategy "in the face of" warning signals, yet represented to the public that there was no risk at play.

**Abbey's Bonus System Created an Incentive for Harley and Other Top Executives to Camouflage the Companies True Risk Exposure**

257.    Abbey's remuneration policy included a unique bonus system, tying executive bonuses to the earnings per share ("EPS") of the Bank's stock and the Bank's ranking in the FTSE 100. In Abbey's 2001 Directors' Report, the Bank set-forth its bonus policy. Under the heading "share matching scheme", Abbey stated:

> Executive directors may take part in a share-matching scheme. Under the scheme, executives may choose to invest some or all of their yearly bonus in the Company's shares ('the purchased shares'). After three years, as long as the executive remains in employment and has not sold the purchased shares, he or she will receive a matching award ('the matching shares') with a value at the start of the three years equal to the value of the pre-tax bonus invest in the purchased shares. These matching shares will be available in full only if the Company's 'earnings per share' growth is more than inflation by an average of at least 7% each year; 10% of the shares will be matched if growth in earnings per shares is more than inflation by an average of 3% each year, and in proportion between these two points. This performance target will apply over a fixed three-year period. (Emphasis added.)

258.    Under the plan, Abbey executives were under pressure to have the Bank's EPS grow each year. Anything that would cause the companies earning to diminish, like a provision charge or a write-down, compromised the executives' bonuses. Thus, Harley and other top executives were motivated to remain silent and not have the Bank take any provisions against bad debts. Moreover, the plan also encouraged executives to refrain from selling shares, as the Bank's share matching would only occur if the shares the employee purchases remained unsold over a three-year period.

259.    Abbey also had an "Executive Share Option Scheme". The plan was described in the Bank's 2001 Directors' Report, which states:

Grants will be made every year and will include a range of demanding performance targets. Because executives will only benefit under the scheme to the extent that the Company's share price rises, executives' interests will be clearly in lin with those of shareholders. The value of the shares under option which an executive may initially receive in a any financial year will not normally be more than twice his or her basic salary. These options can only be exercised in full if:

• <u>The Company's total shareholder return performance is ranked in the top quarter in relation to other financial services companies and the FTSE 100 companies</u>; and

• our earnings per share growth is more than inflation by an average of at least 7% each year.

Some of the options can be exercised in the Company's total shareholder return performance is ranked at the half way point in relation to other financial serviced companies, or to FTSE companies, or if our earnings per share growth is more than inflation by an average of at least 3% each year. (Emphasis added.)

260. The share option scheme, like Abbey's share matching scheme, created an incentive for executives to not report high provisions or write-downs. Moreover, executives were motivated to keep Abbey's stock price inflated so that it ranked in the top-quarter, or at least top-half of the FTSE 100. Thus, executives were motivated to minimize the disclosure of negative news that could lower the Bank's ranking.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: <u>FRAUD-ON-THE-MARKET DOCTRINE</u>

261. At all relevant times, the market for Abbey National securities was an open, well-developed and efficient market for the following reasons, among others:

(a)     Abbey National's ADRs met the requirements for listing, and were listed and actively traded on the OTC Market, a highly efficient market;

(b)     Various Abbey securities were traded on the New York Stock Exchange; the London Stock Exchange; the Berlin Stock Exchange; and the Virt-x

Exchange (which is "a collaboration between the TP Group LDC and the SWX Swiss Exchange to provide an efficient and cost effective pan-European blue chip market" and which is "supervised by the Financial Services Authority in the United Kingdom").

(c)      As a regulated issuer, Abbey National filed periodic public reports with the SEC and the NASD;

(d)      Abbey National regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)      Abbey National was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. Among the analysts that covered the stock during the Class Period were: ABN Amro; Bear Stearns & Co; BNP Paribas; Commerzbank Securities; Credit Lyonnais; Credit Suisse First Boston; Deutsche Bank; Dresdner Kleinwort Wasserstein; Goldman; Sachs & Co; ING Financial Markets; JPMorgan; Lehman Brothers; Merrill Lynch; Morgan Stanley; Sanford C. Bernstein & Co; SG Securities Corporation; Teather & Greenwood; UBS; WestLB Equity Markets; and Williams de Broe.

262.      As a result of the foregoing, the market for Abbey National securities promptly digested current information regarding Abbey National from all publicly available sources and reflected such information in Abbey National's share prices. Under these circumstances, all purchasers of Abbey National securities during the Class Period suffered similar injury through their purchase of Abbey National securities at artificially inflated prices and a presumption of reliance applies. Plaintiff and other members of the Class purchased or otherwise acquired Abbey National ADR securities relying upon the integrity of the market price of Abbey National securities and market information relating to Abbey National, and have been damaged thereby.

**<u>NO SAFE HARBOR</u>**

263.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Abbey National who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder Against All Defendants

264.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

265.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase Abbey National securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

266.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements

not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Bank's securities in an effort to maintain artificially high market prices for Abbey National securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

267.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Abbey National as specified herein.

268.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Abbey National's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Abbey National and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Abbey National securities during the Class Period.

269.    The Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendant was a high-level executive and/or director at the Bank during the Class Period and member of the Bank's management team or had control thereof; (ii) The Individual Defendant, by virtue of his responsibilities and activities as a senior

officer and/or director of the Bank was privy to and participated in the creation, development and reporting of the Bank's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Bank's management team, internal reports and other data and information about the Bank's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Bank's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

270.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Abbey National's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Bank's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

271.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Abbey National securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Abbey National's publicly-traded securities were artificially inflated, and relying directly or

indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Abbey National securities during the Class Period at artificially high prices and were damaged thereby.

272.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Abbey National was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Abbey National securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

273.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

274.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Bank's securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendant**

275.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

276.    Defendant Harley acted as a controlling person of Abbey National within the meaning

of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, participation in and/or awareness of the Bank's operations and/or intimate knowledge of the false financial statements filed by the Bank with the SEC and disseminated to the investing public, Defendant Harley had the power to influence and control and did influence and control, directly or indirectly, the Bank's decision making, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Defendant Harley was provided with or had unlimited access to copies of the Bank's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

277.    In particular, Defendant Harley had direct and supervisory involvement in the day-to-day operations of the Bank and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

278.    As set forth above, Abbey National and the Defendant Harley each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendant's wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Bank's securities during the Class Period.

### THIRD CLAIM
### Breach of Fiduciary Duty
### Against All Defendants

279.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

280.     Defendants owed a fiduciary duty to the Class, as purchasers and owners of Abbey National securities.

281.     Defendants, by means of their making the foregoing false and misleading statements, breached their fiduciary duty to the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

a.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

b.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 24, 2005          **GOODKIND LABATON RUDOFF & SUCHAROW**

By: *S/Christopher J. Keller*

Christopher J. Keller (CK-2347)
Shelley Thompson (MT-4109)

100 Park Avenue, 12th Floor
New York, New York 10017-5563
Telephone:     (212) 907-0700
Facsimile:     (212) 883-7053

*Local Counsel for Plaintiffs*

**GLANCY BINKOW & GOLDBERG LLP**
Peter A. Binkow
Neal A. Dublinsky
Daniel Hargis
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

-and-

Robin Bronzaft Howald
1501 Broadway, Suite 1900
New York, NY 10036
Telephone:     (917) 510-0009
Facsimile:     (646) 366-0895

**MILLER SHEA PC**
Powell Miller
1301 West Long Lake Road, Suite 135
Troy, Michigan 48098
Telephone:     (248) 267-8200
Facsimile:     (248) 267-8211

*Co-Lead Counsel for Plaintiffs*

**VANOVERBEKE MICHAUD & TIMMONY, P.C.**
Michael VanOverbeke
Michael Moco
79 Alfred Street
Detroit, Michigan 48201
Telephone:     (313) 578-1200
Facsimile:     (313) 578-1201

**SMITH & SMITH LLP**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, Pennsylvania 19020
Telephone:     (215) 638-4847
Facsimile:     (215) 638-4867

**RONALD BELL & ASSOCIATES, P.C.**
Raynard Struck
610 7th Street NW
Albuquerque, New Mexico 87102-2019
Telephone:     (505) 242-7979
Facsimile:     (505) 243-7192

*Counsel for Plaintiffs*

## PROOF OF SERVICE BY MAIL

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On     March 24, 2005, I served the following:

1    **AMENDED CLASS ACTION COMPLAINT**

on the parties shown below by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California.

## SEE SERVICE LIST

Executed on March 24, 20054, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

　　*S/Kyaa Heller* 　　　　　　
　　Kyaa D.  Heller

**Abbey National plc Securities Ltigation**

**SERVICE LIST**

*For Plaintiffs*

Howard G. Smith
3070 Bristol Pike
Bensalem, PA 19020
Telephone:    (215) 638-4847

Michael Goldberg
Napoli & Associates
233 Broadway, Suite 3508
New York, NY 10279

Michael Moco
VanOverbeke Michaud & Timmony
79 Alfred Street
Detroit, MI 48201
Telephone:    (313) 578-1200

Michael VanOverbeke
VanOverbeke Michaud & Timmony
79 Alfred Street
Detroit, MI 48201
Telephone:    (313) 578-1200

Powell Miller
Miller Shea, P.C.
1301 West Long Lake Rd.
Troy, MI 48098
Telephone:    (248) 267-8200

Raynard Struck
Ronald Bell & Associates, P.C.
610 Seventh, NW
Alburquerque, NM 87102
Telephone:    (505) 242-7979

Robin Bronzaft Howald
Glancy Binkow & Goldberg LLP
1501 Broadway, Suite 1900
New York, NY 10036
Telephone:    (917) 539-9208
Facsimile:    (646) 366-0895

Christopher J. Keller
Goodkind Labaton Rudoff & Sucharow LLP
100 Park Avenue
New York, NY 10017
Telephone:    (212) 907-0853
Facsimile:    (212) 883-7053

*For Defendants*

Ian Harley
c/o Abbey National PLC
c/oCT Corporation
111 Eighth Avenue
New York, New York 10011
Telephone:    (800)624-0909
Facsimile:    (212)590-9060

Jennifer L. Kroman
Cleary Gottlieb Steen & Hamilton, LLP
1 Liberty Plaza
New York, NY 10006
212-225-2000
Facsimile: 212-225-3499
Email: maofiling@cgsh.com