UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

THE CITY OF STERLING HEIGHTS          :
POLICE AND FIRE RETIREMENT SYSTEM,
Individually and on behalf of all     :
others similarly situated,
                                      :
                    Plaintiff,                      **OPINION**
                                      :
            - against -                             05 Civ. 2141 (DC)
                                      :
ABBEY NATIONAL, PLC, and IAN
HARLEY,                               :

                    Defendants.       :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**   (See last page)

**CHIN, D.J.**

          This is a securities fraud class action against a
London-based bank and its former Chief Executive Officer.
Plaintiff The City of Sterling Heights Police and Fire Retirement
System (the "Retirement System"), on behalf of itself and other
similarly situated shareholders, alleges that defendants Abbey
National, PLC ("Abbey"), and Ian Harley violated Sections 10(b)
and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5
by misrepresenting the health of Abbey's investment portfolio, in
light of its substantial holdings in Enron Corp., Tyco
International Ltd., and WorldCom, Inc. ("Enron," "Tyco," and
"WorldCom," respectively).  Plaintiff also asserts a common law
claim for breach of fiduciary duty.

          Defendants move to dismiss the amended complaint for
failure to state a claim upon which relief may be granted
pursuant to Fed. R. Civ. P. 12(b)(6) and failure to comply with

Fed. R. Civ. P. 9(b). For the reasons set forth below, defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND

### A. The Facts

The facts alleged in the amended complaint are assumed to be true for the purposes of this motion and are as follows:

### 1. The Parties

Abbey is a financial services corporation organized under the laws of England with its principal offices in London. (Compl. ¶ 16). Abbey offered American Depository Receipts ("ADRs") in U.S. markets.[1] (Id. ¶¶ 1, 26). Abbey had several divisions, including the Wholesale Banking Division ("Wholesale Banking"), which was involved in international asset backed investments, wholesale lending, and asset financing. Liquidity and funding for Abbey's operations were provided through its treasury, a section of Wholesale Banking. (Id. ¶ 17).

Harley became Abbey's Chief Executive Officer ("CEO") in 1998 and was CEO at all relevant times. (Id. ¶¶ 18, 35). Under his direction, Wholesale Banking made substantial

_____

[1] An ADR provides a vehicle for U.S. investors to hold foreign equity securities and trade them in the United States in the same way as domestically-issued securities. It is a stock certificate that represents the foreign shares of the company typically deposited with a U.S. bank. See In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 171-72 (S.D.N.Y. 2003) (citing American Depository Receipts, 1991 WL 294145, at *2 (S.E.C. May 23, 1991)).

.

investments in the securities of Enron, Tyco, and WorldCom.  (Id. ¶¶ 6, 36).

The Retirement System sues individually and as proposed class representative on behalf of all persons, excluding defendants, who purchased Abbey's ADRs on the open market between July 24, 2001, and June 10, 2002 (the "Class Period"), at artificially inflated prices, and have been damaged as a result. On consecutive days from March 5 to 8, 2002, in four transactions, the Retirement System purchased a total of 2,760 Abbey shares.  (Kroman 7/12/05 Decl. Ex. C at A).

### 2. **Abbey's Financial History**

When Harley assumed the helm in 1998, Abbey began to move away from traditional retail and mortgage services into corporate banking, through expansion of Wholesale Banking. (Compl. ¶ 35).  By 2001, Wholesale Banking was considered a "marvelous" success.  (Id. ¶ 47).  Abbey sought to triple the division's profits and thereby increase its standing from the sixth largest bank in Britain to the fifth largest in the world by 2005.  (Id. ¶ 46).  This transition involved assuming greater levels of risk to generate higher returns.  (Id. ¶ 251).

As part of the expansion, Abbey purchased the bonds of Enron, Tyco, and WorldCom.  (Id. ¶ 36).  Despite Wholesale Banking's substantial investment in these three corporations, Abbey consistently reported that it was "in good shape," there were "no gaping holes" in its investments, and failed to disclose the substantial risk it faced throughout the Class Period.  These

investments turned out to be very costly to Abbey when all three corporations experienced financial and legal woes from 2001 to 2002, as detailed in the amended complaint.  (<u>See</u> <u>id.</u> ¶¶ 51, 96-124).

### 3.   Abbey's Announcement of Lower Profits and Massive Write-Offs

On June 10, 2002, Abbey "shocked the market" by announcing "substantially lower than" expected profits and "massive write-offs and provisioning in its Wholesale Banking portfolio for the first six months of 2002."  (<u>Id.</u> ¶¶ 10, 182).  Defendants attributed the write-offs and provisioning to "various corporate exposures, particularly in the telecoms" and "cable sectors," with Harley pointing specifically to Tyco's collapse.  (<u>Id.</u> ¶¶ 63, 183, 186).  The provisions for the first half of 2002 totaled £256 million, more than the amount previously projected for the entire year.  (<u>Id.</u> ¶¶ 10, 182).

Following the announcement, Abbey's ADR share price fell from $29.40 per share on Monday, June 10, 2002, to $23.80 on Friday, June 14, 2002.  (<u>Id.</u> ¶ 184).  The disclosure was universally acknowledged as unexpected by U.S. and British financial press and analysts.  (<u>Id.</u> ¶¶ 185-97).  Later that month, Abbey's holdings in Tyco and WorldCom bonds became public, resulting in further deterioration of Abbey's market value.  Although the precise extent of Abbey's holdings and losses from Tyco and WorldCom is unknown, at the very least, it was in the tens of millions of British pounds.  (<u>Id.</u> ¶¶ 77, 198-200).

Harley was eventually forced to resign on July 19, 2002, under intense pressure from investors. (Id. ¶ 201). After his departure, it was revealed that Abbey's provisioning for bad debt in 2002 totaled £902 million, double the amount announced at the mid-year point. For the first time in its history, Abbey was forced to report a loss, totaling £984 million. (Id. ¶ 10).

## B. **Procedural History**

Plaintiff commenced this action by filing a complaint in the District of New Mexico on June 10, 2004. After the case was transferred to this Court on February 15, 2005, plaintiff served and filed the amended complaint on March 24, 2005. This motion followed.

## **DISCUSSION**

Defendants move to dismiss, inter alia, on the following grounds: the § 10(b) claims fail because plaintiff's allegations do not fall within the scope of the statute and plaintiff fails to allege a prima facie claim of a federal securities fraud violation; the § 20(a) claim fails because plaintiff does not allege a primary violation of the federal securities laws; and the breach of fiduciary duty claim fails because English law governs and no such claim exists here under English law. I first discuss the general standard on a motion to dismiss before turning to each of these grounds.

## A. **Standard on a Motion to Dismiss**

A complaint may not be dismissed under Fed. R. Civ. P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The test for dismissal is not whether the plaintiff is likely to prevail, but whether it is entitled to offer evidence to support its claims. Id. "In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991). The court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).

On a motion to dismiss a securities action, a district court may consider documents required to be publicly filed with the S.E.C. that bear on the adequacy of disclosure. See Kramer, 937 F.2d at 773-74. Accordingly, I consider both the allegations contained in plaintiff's amended complaint and the publicly filed documents appended to defendants' motion to dismiss. See Donoghue v. Am. Skiing Co., 155 F. Supp. 2d 70, 72 n.3 (S.D.N.Y. 2001).

**B.  Section 10(b)**

Defendants make two arguments with respect to the claims under § 10(b): first, that plaintiff raises mere allegations of mismanagement that fall outside the scope of §

10(b), and second, that plaintiff fails to sufficiently plead the elements of a § 10(b) claim.  I address each of these arguments in turn.

### 1.  **Scope**

Allegations of corporate mismanagement generally fall outside the scope of § 10(b) because they fail to allege conduct that is considered "manipulative or deceptive."  In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 617 (S.D.N.Y. 2005) (citing Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 473-74, 477 (1977)).  Defendants contend that they cannot be liable under § 10(b) for making bad investments and failing to predict that holdings in WorldCom and Tyco would result in significant losses.  Such complaints of an "investment strategy gone sour" merely find fault with Abbey's management of its business and, thus, lie beyond the scope of § 10(b).  (Def. Supp. Mem. at 1).

To the extent that plaintiff merely second-guesses defendants' internal business decisions, its allegations must be dismissed.  See In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004) (dismissing allegations defendants failed to adhere to risk management policies as mismanagement claims); Ciresi v. Citicorp, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (finding "claim that the defendants did not plan their loan reserves properly is essentially" one of mismanagement).  The amended complaint, however, contains more than just mere allegations of mismanagement.  See JP Morgan Chase, 363 F. Supp. 2d at 617.  Rather, plaintiff claims that defendants

misrepresented the health of Abbey's portfolio, the extent of
defendants' knowledge of problem areas in Abbey's investments.
and the adequacy of provisioning in Wholesale Banking, which
purportedly lulled plaintiff into investing in Abbey's
securities.  See Suez Equity Investors, L.P. v. Toronto-Dominion
Bank, 250 F.3d 87, 99 (2d Cir. 2001) (rejecting mismanagement
defense where "affirmative misrepresentation" allegedly made "to
outside investors, concerning the quality of the proffered
securities").  The federal securities laws "prohibit
misrepresentation of material facts, even when those material
facts relate to corporate mismanagement." JP Morgan Chase, 363
F. Supp. 2d at 617.

I address the sufficiency of plaintiff's specific
allegations of misrepresentation in the discussion below.

   2.  **Sufficiency**

       a.   **Applicable Law**

To state a cause of action under § 10(b) and Rule
10b-5, plaintiff must allege that defendants: (1) in connection
with a purchase or sale of securities; (2) with scienter; (3)
made a material false representation or omitted to disclose
material information; (4) upon which plaintiff relied;(5)
proximately causing plaintiff to suffer injury.  Lentell v.
Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); see also
Dura Pharm., Inc. v. Broudo, 544 U.S. 336, --, 125 S. Ct. 1627,
1631 (2005).  Securities fraud allegations under § 10(b) and Rule
10b-5 are subject to the heightened pleading requirements of Rule

9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).[2]

Defendants contend that plaintiff does not allege a prima facie case of securities fraud because plaintiff fails to allege material misrepresentations or omissions, scienter, or loss causation.

### i. **Materiality**

A fact is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).

"[F]orward-looking statements" that "reflect hope, adequately tinged with caution," when considered in the context of "the total mix of information available to the market," are not misleading under the "bespeaks caution" doctrine. San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996); see also 15 U.S.C. §§ 77z-2(a) & (c)(1), 78u-5(a) & (c)(1). When cautionary language

---

[2] The PSLRA "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Dura Pharm., 544 U.S. at --; 125 S. Ct. at 1633 (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

is part of a disclosure,

> [t]he touchstone of the inquiry is not
> whether isolated statements within a document
> were true, but whether defendants'
> representations or omissions, considered
> together and in context, would affect the
> total mix of information and thereby mislead
> a reasonable investor regarding the nature of
> the securities offered.

Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir.
2002).  The language of the warning, however, "must precisely
address the substance of the specific statement or omission that
is challenged."  In re Nokia Corp. Sec. Litig., No. 96 Civ. 3752
(DC), 1998 WL 150963, at *8 (S.D.N.Y. Apr. 1, 1998) (internal
citations and quotation marks omitted).

## ii.  Scienter

The Second Circuit has held that to plead scienter in a
securities fraud claim, a complaint may (1) allege facts
constituting strong circumstantial evidence of conscious
misbehavior or recklessness, or (2) allege facts showing that
defendants had both motive and opportunity to commit fraud.
Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000).  A strong
inference of fraudulent intent may be established by alleging
that defendants (1) benefitted in a concrete and personal way
from the purported fraud; (2) engaged in deliberately illegal
behavior; (3) knew facts or had access to information suggesting
that their public statements were not accurate; or (4) failed to
check information they had a duty to monitor.  Novak v. Kasaks,
216 F.3d 300, 311 (2d Cir. 2000).

Several limitations on liability for reckless conduct apply. First, plaintiff cannot simply allege "fraud by hindsight." Id. at 309. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." Id. (citing Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)). Thus, allegations that defendants should have anticipated future events and disclosed certain facts earlier than they did are not sufficient to make out a claim of fraud. Id. (citing Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995)).

Second, the corporation is not required to put forth "an overly gloomy or cautious picture of current performance and future prospects." Id. (internal citations omitted). "[M]isguided optimism is not a cause of action, and does not support an inference of fraud." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994); see also Rothman, 220 F.3d at 90 ("Generally, poor business judgment is not actionable under [§] 10(b) . . . . The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness."). While mere puffery is insufficient to state a claim of securities fraud, public statements must be "consistent with reasonably available data" and should not misrepresent existing facts. Novak, 216 F.3d at 309, 315.

### iii. **Loss Causation**

Private securities fraud actions are available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." Dura Pharm., 544 U.S. at --, 125 S. Ct. at 1633.  To adequately plead loss causation, plaintiff must allege their losses were (1) a "foreseeable consequence" of defendants' alleged misrepresentations or omissions, and (2) caused by the "materialization of the concealed risk." Lentell, 396 F.3d at 172-73; see also 15 U.S.C. § 78u-4(b)(4); Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003) (describing loss causation as the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff").  In other words, plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 296 F.3d at 173.

### b. **Application**

Keeping in mind the pleading requirements for a § 10(b) claim, I turn now to defendants' alleged misstatements and omissions as follows: 1) the July 2001 statements at the start of the Class Period; 2) the October 2001 statements following the resignation of Wholesale Banking chief Gareth Jones; 3) the statements in response to Enron's collapse at the end of 2001; and 5) statements and omissions from the first half of 2002.

### i. **July 2001 Statements**

In July 2001, the start of the proposed Class Period, defendants stated that Abbey "is in better shape than ever" and projected a "strong track record of double digit profit growth." (Compl. ¶¶ 78-80). Harley also stated that Abbey expected to set aside less money for bad loans in the second half of the year. (Id. ¶ 82). In addition, defendants claimed that Abbey's credit quality was tightly managed. (Id. ¶ 81).

The first three statements are not actionable, for they are mere general statements of optimism that "lack the sort of definite positive projections that might require later correction." San Leandro, 75 F.3d at 811 (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) and finding comments such as the company "should deliver income growth consistent with its historically superior performance" and "we are optimistic about 1993" to be "relatively subdued general comments" that were not actionable). These predictive statements blend optimism with caution about the impact of "the slowdown in global markets . . . and increased provisioning levels." (Compl. ¶ 80). Moreover, plaintiff does not allege facts showing that defendants had actual knowledge that any of these statements were false when they were made. Plaintiff's allegation that defendants were repeatedly warned of "poor risk controls" in the mid-1990s does not create a sufficient basis for determining that such a description was false or misleading in 2001. (Id. ¶¶ 37-39).

Thus, considering the total mix of information, the statements made on July 24, 2001 do not reflect misleading optimism or fraud. Accordingly, the motion to dismiss is granted with respect to defendants' July 2001 statements.

**b.  October 2001 Statements**

Defendants made additional predictive statements in October 2001, following Jones's resignation as head of Wholesale Banking and preceding Enron's collapse. These include comments on SEC forms that Wholesale Banking "is in very good shape as it moves into the next stage of its development," is "well placed to take advantage of future opportunities," and expects to continue its "value-enhancing opportunities through selective acquisition of good quality assets" (id. ¶¶ 85, 90, 91); a press release stating Abbey was "well-positioned to weather the current economic uncertainty" (id. ¶ 87); and Harley's comment "anticipat[ing] an upturn in the U.S. economy in the second quarter of next year" (id. ¶ 88). Because these statements were tempered by cautionary language about the impact of "heightened volatility in the US" (id. ¶ 89) and acknowledgment of "the uncertain global economic landscape" (id. ¶ 94), they are also inactionable as general statements of optimism.

Plaintiff claims that these warnings were too "amorphous" to adequately warn about the concealed risk that Abbey faced from its holdings in Enron and Tyco. See In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) ("Generalized disclosures of amorphous risks will

not shield defendants from liability as the cautionary language must be too prominent and specific to be disregarded and must warn investors of exactly the risk that plaintiffs claim was not disclosed.") (internal citation and quotation marks omitted). Because plaintiff contends that defendants had access to contrary knowledge about the health of Abbey's investments, plaintiff must specifically identify the source of that information. See Novak, 216 F.3d at 309.

Plaintiff relies largely on the statements of an unnamed executive in Wholesale Banking who said that Abbey should have known about the riskiness of its Enron acquisitions because of Enron's dropping stock price throughout 2001 and the resignation of Enron's CEO and president in August 2001. (Compl. ¶ 253).[3] In addition, Jones told Abbey upon his departure that he was concerned about the riskiness of Wholesale Banking's investments and that Abbey should take out "credit protection" for its potential £500 million exposure to Tyco. (Id. ¶¶ 86, 198, 199). Even taking these allegations as true, they do not sufficiently plead a strong inference of fraud. The securities laws do not require defendants to speculate about future events.

---

[3]    Plaintiff may rely on confidential sources in its pleading so long as "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314. Because plaintiff's source is identified as a "senior executive" in Wholesale Banking (Compl. ¶ 249), such an employee is likely to have access to the knowledge claimed. See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004) (accepting plaintiffs' confidential sources).

Knowledge of potential concerns about certain holdings in the portfolio, without more, does not preclude optimistic statements about overall future performance.

Harley also described "no significant deterioration in credit quality" since the first half of 2001 and claimed there were "no black holes [in Abbey's portfolio] and if there were we would have to say so."  (Id. ¶¶ 87, 89).  Based on the same information from Jones and the confidential source, plaintiff claims these statements were false or misleading.  Again, at most, plaintiff alleges fraud by hindsight.  It has not alleged facts sufficient to give rise to a "strong inference" that defendants knew these statements were false or misleading at the time they were made.  Thus, the motion to dismiss is granted as to statements released by Abbey and Harley in October 2001.

### c.    Statements After Enron's Collapse in Late November 2001

On November 28, 2001, Enron's bonds were downgraded by all three major credit agencies to junk status.  The following day, Abbey announced it would take a £95 million provision for its exposure and the new head of Wholesale Banking reassured investors that "[n]othing else in our books gives me huge cause for concern."  (Id. ¶¶ 51, 93).  Abbey also stated on its SEC forms that otherwise profits were better than the previous year and while Abbey "experienced some limited deterioration," "[c]redit quality continues to be monitored closely in light of the uncertain global economic landscape."  (Id. ¶ 94).

Plaintiff argues that defendants should have known that Abbey's statements were inaccurate in light of Jones's warning to take out credit protection on Tyco holdings.  While Jones's statement may have put Abbey on notice of potential weaknesses in its portfolio, plaintiff has not alleged facts that constitute strong circumstantial evidence that defendants knew or were reckless in not knowing that these statements were false or misleading at the time they were made.  There is nothing to suggest that as of November 2001, anything else was a "huge cause for concern."  After all, Abbey had just taken out a £95 million provision and disclosed this provision the very day after Enron's public demise.  Thus, the motion to dismiss is granted as to statements released by defendants in late 2001.

### d. Statements and Omissions in 2002 Amid Growing Concern over Tyco and WorldCom

Plaintiff does, however, adequately plead securities fraud based on the 2002 statements and omissions alleged in the amended complaint.  The remainder of the amended complaint alleges that throughout the first half of 2002, defendants made misleading material statements that: Wholesale Banking remained a "sound business" (Compl. ¶ 127) and would continue to be a "growth proposition" (id. ¶ 125); defendants had "made appropriate, in fact, very conservative, we feel, provisions" (id.; see also id. ¶ 138); defendants were "very happy with the present situation" (id.); and Wholesale Banking had "already implemented measures to re-focus the business and reduce its risk

- 17 -

profile" (id. ¶ 127; see also id. ¶¶ 136-37, 152).[4]  Defendants

made these misrepresentations, plaintiff contends, while in

possession of significant contrary information about the health

of their investment portfolio.  In fact, as plaintiff contends

and as discussed below, defendants knew or should have known that

their substantial holdings in Tyco and WorldCom presented serious

risks, and that they still had not made adequate provisions or

taken sufficient steps to reduce Abbey's risk profile.  Their

failure to disclose these risks, plaintiff contends, constituted

a material omission.

## i.  **Materiality**

First, plaintiff adequately alleges material

misstatements and omissions.  Unlike the statements from 2001,

these were not mere rosy predictions.  Instead, they were

directed at Abbey's then-existing financial condition and made at

a time when defendants were aware or should have been aware of

contrary information.  See In re Reliance Sec. Litig., 91 F.

Supp. 2d 706, 721 (D. Del. 2000) (finding statements about "then-

---

[4]     Defendants urge the Court to disregard alleged
misrepresentations following plaintiff's purchase of the Abbey
ADRs in March 2002.  It is proper to consider these statements
where, as here, plaintiff alleges misleading pre-purchase
statements and fraud on the market.  Cf. Denny v. Barber, 576
F.2d 465, 468-69 (2d Cir. 1978) (finding plaintiff could not
represent class where no fraudulent statements alleged prior to
his purchase of shares).  "Post-purchase statements are relevant
to the course of wrongful conduct alleged by a plaintiff in a
securities action and [plaintiff] has sued on behalf of the Class
of persons who purchased stock during the entire Class Period."
Nicholas v. Poughkeepsie Sav. Bank/FSB, No. 90 Civ. 1607 (RWS),
1990 WL 145154, at *5 (S.D.N.Y. Sept. 27, 1990).

present" financial state of company were not forward-looking projections protected by PSLRA's safe harbor). Plaintiff's claims are based on defendants' affirmative statements as well as omissions for remaining silent when prior statements became misleading in light of new information. See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993) ("[A] duty to disclose arises when disclosure is necessary to make prior statements not misleading."). As it became increasingly apparent in early 2002 that Abbey's investments in Tyco and WorldCom were going sour, plaintiff contends that defendants incurred a duty to correct prior misleading statements that minimized or denied any problems.

For example, on February 21, 2002, when asked about Abbey's risk exposure after Enron, "Is that finished now? Is there any more risk?", Harley told the press: "[W]e've done a very thorough review . . . of our entire . . . portfolio. We've made appropriate, in fact, very conservative . . . provisions. And, of course, we've been entirely transparent throughout the process and . . . put our hand up for the exposure that we do have. So we're very happy with the present situation." (Compl. ¶ 126).

Plaintiff alleges that such statements led investors to believe that there truly were no causes for concern at Abbey, when in fact, there were "several major black holes," namely Tyco and WorldCom. (Id. ¶ 6). The reports of massive problems at these companies in early 2002 were frequent and well-publicized:

shares in both companies dropped significantly in value in the first two months of the year. (Id. ¶ 7). Tyco's share price dropped by some 49% in the wake of questions about its accounting and corporate governance practices, and its bonds were downgraded three notches to one notch above junk status. (Id. ¶¶ 7, 97-110, 116, 118). From February to March 2002, WorldCom stock lost more than 44% of its value amid revelations of massive loans it had made to its CEO, and the Securities and Exchange Commission ("SEC") launched an investigation of WorldCom on March 11, 2002. (Id. ¶¶ 7, 111-13, 119-22, 143-47). By late April 2002, WorldCom's debt rating had also been cut to one notch above junk status amid massive lay-offs and slashing revenue projections. (Id. ¶¶ 156-58). Finally on May 9, 2002, WorldCom's debt was downgraded to junk status. (Id. ¶ 178).

Yet, defendants not only remained silent about the extent of Abbey's exposure to the losses at WorldCom and Tyco, but repeatedly stated throughout March 2002 that Abbey was actually reducing its "risk profile" and making "appropriate, conservative provisions." (Id. ¶¶ 136, 137, 152-53). In late April 2002, Abbey announced at its annual shareholders meeting that "[t]he business is trading in line with market expectations for the full year" and Harley stated that "[t]he pivot has passed" with respect to U.S. corporate defaults. (Id. ¶¶ 9, 162, 164). The silence was particularly misleading, according to plaintiff, because of certain statements defendants had made just several months earlier. In October 2001, Harley had stated there

are "no serious problems" and "no black holes," and that "if there were we would have to say so." (Compl. ¶¶ 4, 89). After Abbey was forced to take a £95 million provision to absorb the loss from Enron in November 2001, the Wholesale Banking head had announced that "[n]othing else in our books gives me huge cause for concern." (Id. ¶¶ 6, 89). Abbey failed to correct these statements until its announcement of massive provisioning in June 2002. (Id. ¶ 10). If it is true that defendants knew the direness of the situation and failed to acknowledge that truth, then these statements and omissions over the first half of 2002 were false and misleading.

Moreover, these statements and omissions were material to plaintiff's decision to purchase Abbey shares. Because the specific holdings in the Wholesale Banking portfolio were not publicly disclosed, investors had no other source of information other than Abbey's disclosures to analyze the risk exposure. The statements were often made in response to specific inquiries about the riskiness of Abbey's portfolio, and created an expectation that Abbey was being completely transparent. Defendants' contentions that they merely made subdued general comments are unavailing. For support, they point to Abbey's statements on SEC forms in March 2002 that the challenges of 2001 were "keenly felt," 2002 would be "another challenging year," "the uncertain outlook for the U.S. economy" would "constrain profit growth," and there was "work to be done in the Wholesale Bank." (Kroman 7/12/05 Decl. Ex. H. at 2, 4, 6, 8; Def. Supp.

Mem. at 13-14). Such general cautionary statements failed to apprise plaintiff of the relevant risk arising from defendants' substantial Tyco and WorldCom holdings, especially in light of the total mix of information available. As the Second Circuit has stated, warnings will not dispel liability where defendants "gloss over the relevant risk, focus investors' attention elsewhere, and thereby lead them down some primrose path." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 360 (2d Cir. 2002).

### ii. **Scienter**

Second, plaintiff adequately alleges scienter -- in particular, facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. "[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." Novak, 216 F.3d at 308 (internal citation and quotation marks omitted). Plaintiff has alleged sufficient facts at this stage to support such an inference including:

(1) statements from a confidential source, an executive in Wholesale Banking, that the downfall in stock prices and downgrading of Tyco and WorldCom's bonds almost to junk status would have triggered a reevaluation of Abbey's credit exposure (Compl. ¶ 252);

(2) repeated statements by Harley and others about Abbey's extensive structure for risk monitoring (see, e.g., id. ¶¶ 236-48);

- 22 -

(3) Harley's admission in February 2002 that defendants thoroughly reviewed Wholesale Banking's portfolio in response to a question about whether there was "any more risk" after Enron's collapse (id. ¶ 126);

(4) the extent of press coverage surrounding Tyco and WorldCom's decline, including an SEC investigation of WorldCom launched in March 2002 (id. ¶¶ 96-161);

(5) the magnitude of Abbey's provisioning on and after the June 10, 2002 announcement, more than doubling expected projections (id. ¶¶ 10, 188), see In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (finding "the mere fact that the company had to make a large correction is some evidence of scienter");

(6) the fact that the write-down concerned a core operation, Wholesale Banking, which was responsible for nearly a third of Abbey's entire profit and critical to funding of the entire corporation, and about which key officers should have been intimately informed (Compl. ¶¶ 17, 36), see Atlas Air, 324 F. Supp. 2d at 490 (imputing knowledge of falsity to key officers who should have known facts about company's core operations); and

(7) extensive allegations of violations of Generally Accepted Accounting Principles ("GAAP"), which "standing alone, are insufficient to state a securities fraud claim," but may support a finding of scienter when "coupled with evidence of corresponding fraudulent intent," Novak, 216 F.3d at 309 (citation and quotation marks omitted) (Compl. ¶¶ 213-32).

### iii. **Loss Causation**

Finally, plaintiff adequately pleads loss causation. It alleges that Abbey concealed the magnitude of the risk associated with its portfolio and the inadequacy of its credit provisioning, which led plaintiff to purchase Abbey's securities at inflated prices. When the concealed risk materialized following Abbey's June 10, 2002 announcement, exposing Abbey's lack of adequate provisions, Abbey's share price foreseeably declined. Unlike the plaintiffs in Dura Pharmaceuticals, plaintiff here sets out a claim that defendants' "share price fell significantly after the truth became known" and not merely that their loss consisted of artificially inflated purchase prices. 544 U.S. at --; 125 S. Ct. at 1634. This allegation sufficiently establishes the causal connection between that economic loss and the misrepresentation at the pleading stage.

Defendants rely on the Second Circuit's decision in Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005), to argue that loss cannot be shown where Abbey's share price had been steadily declining throughout the Class Period and long before the June 10, 2002 Announcement. Their reliance on that decision for the proposition that plaintiff must negate other potential causes of its loss, such as general market decline, is misplaced. The Second Circuit stated in Lentell:

> [W]here . . . substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an

inference that it was defendant's fraud --
                    rather than other salient factors -- that
                    proximately caused plaintiff's loss; or (ii)
                    facts sufficient to apportion the losses
                    between the disclosed and concealed portions
                    of the risk that ultimately destroyed an
                    investment.

396 F.3d at 177.  Here, no such specific and unambiguous "indicia

of risk" appeared on the face of the disclosures made by

defendants.

          Moreover, contemporaneous with the announcement, 48

million shares were traded, "seven times the daily average of the

past six months," and Abbey's credit rating was cut by Standard

and Poor's for the first time since 1995.  (Compl. ¶¶ 184, 191).

These events support a causal link between the exposure of the

risk and the loss.  Moreover, the 4.3% decline in share price,

equivalent to some £200 million of Abbey's market value, after

Abbey's holdings in WorldCom became public in late June 2002,

also supports attributing the loss to Abbey's concealment of its

investment risk.  (Id. ¶ 200).  Harley also specifically pointed

to Tyco's collapse as a reason for the massive provisioning.

(Id. ¶ 186).  While defendants may ultimately show that some

intervening event caused plaintiff's loss, "such is a matter of

proof at trial and not to be decided on a Rule 12(b)(6) motion."

Emergent Capital, 343 F.3d at 197.

          Drawing all factual inferences in plaintiff's favor, I

find that plaintiff has made sufficient allegations to make out a

prima facie § 10(b) and Rule 10b-5 claim with respect to these

statements.  Accordingly, defendants' motion is denied with

respect to claims arising out of alleged misrepresentations in 2002.

## C.  **Section 20(a)**

To withstand a motion to dismiss a § 20(a) claim, plaintiff must allege: (1) an underlying primary violation by the controlled person; (2) control over the controlled person; and (3) particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person.[5] Ellison v. Am. Image Motor Co., 36 F. Supp. 2d 628, 637 (S.D.N.Y. 1999) (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).  Defendants contend that plaintiff's § 20(a) claim must be dismissed because plaintiff fails to allege a primary violation of § 10(b).  Because I find that plaintiff adequately alleges a primary violation, defendants' motion to dismiss the § 20(a) claim is denied.  See Manavazian v. Atec Group, Inc., 160 F. Supp. 2d 468, 485 (E.D.N.Y. 2001).

## D.  **Breach of Fiduciary Duty**

Defendants argue that English law governs plaintiff's claim for breach of fiduciary duty under the "internal affairs" doctrine, and that under English law, plaintiff's claim must be dismissed.  I agree, in both respects.

---

[5]     Section 20(a) of the Exchange Act provides that "[e]very person who . . . controls any person liable [for violation of §§ 10(b) or Rule 10b-5] . . . shall also be liable jointly and severally with and to the same extent as such controlled person."  15 U.S.C. § 78t(a).

Under New York law,[6] "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation." <u>Scottish Air Int'l, Inc. v. Brit. Caledonian Group, PLC</u>, 81 F.3d 1224, 1234 (2d Cir. 1996) (citations omitted). This includes claims brought by a shareholder against a corporation for breach of fiduciary duty. <u>See, e.g.</u>, <u>Polar Int'l Brokerage Corp. v. Reeve</u>, 187 F.R.D. 108, 116 (S.D.N.Y. 1999). Because Abbey is incorporated under the laws of England, plaintiff's fiduciary duty claim is governed by English law.

Plaintiff argues that pursuant to the choice-of-law provision in the Deposit Agreement between Abbey and individual ADR investors, New York law governs.[7] Plaintiff contends that the "all rights" language in the deposit agreement is broad enough to encompass a claim for breach of fiduciary duty. But the instant provision is distinguishable from the contractual provisions discussed in the cases plaintiff cites. In those cases, the parties expressly contracted to have any cause of action or controversy adjudicated under New York law "without giving effect to conflict of law principles." <u>See</u> <u>Turtur v. Rothschild Registry Int'l, Inc.</u>, 26 F.3d 304, 309 (2d Cir. 1994);

_____

[6]     Choice-of-law rules of the forum state apply to the adjudication of a supplemental state law claim. <u>See</u> <u>N. Atl. Instruments, Inc. v. Haber</u>, 188 F.3d 38, 43 (2d Cir. 1999).

[7]     The agreement states: "This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the state of New York."  (Dublinsky Aff. Ex. 5).

About.com, Inc. v. Targetfirst, Inc., No. 01 V 1665 (GBD), 2002
WL 826953, at *2 (Apr. 30, 2002). Moreover, none of the cases
cited by plaintiff involves a choice-of-law provision in conflict
with a recognized choice-of-law principle, such as the internal
affairs doctrine.

In contrast, at least one state court of appeals has
addressed precisely this scenario where a plaintiff sought to
enforce a New York choice-of-law provision in a deposit agreement
against an Irish corporation. See Tomran v. Passano, 159 Md.
App. 706 (2004). Interpreting language identical to Abbey's
deposit agreement with plaintiff and recognizing the state's
preference for enforcement of choice-of-law contractual
provisions, the court still found that the "all rights" language
in the deposit agreement could not "be read so broadly as to
reflect an intention by [the foreign corporation issuer] to cede
to the law of New York matters concerning its internal affairs."
Id. at 721.

Under English law, neither companies nor directors owe
fiduciary duties to individual shareholders. (Chivers Op. ¶¶ 11,
16).[8] See also Polar Int'l, 187 F.R.D. at 116 n.7 (noting that
under English law directors owe duties to the companies, and not
individual stockholders). Consequently, a shareholder may only

_____

[8]     Defendants submit an affidavit of English barrister
David Chivers, uncontested by plaintiff, as evidence of English
law. U.S. courts frequently rely on such opinions for this
purpose. See, e.g., CSFB HOLT LLC v. Collins Stewart Ltd., No.
02 Civ. 3069 (LBS), 2004 WL 1794499, at *7 (S.D.N.Y. Aug. 10,
2004) (relying on joint opinion of two English barristers as
statement of English law).

assert a derivative claim for breach of fiduciary duty on behalf
of the corporation, and only after the corporation has refused to
assert the claim itself. (Chivers Op. ¶¶ 24, 26). Plaintiff has
not alleged that Abbey has refused to bring such a claim or
sought to explain why it did not request that Abbey take such
action pursuant to the pleading requirements of Fed. R. Civ. P.
23.1.[9] Accordingly, this claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is
granted in part and denied in part. The motion is granted with
respect to alleged § 10(b) violations arising from
misrepresentations in 2001 and the breach of fiduciary duty
claim. The motion is denied with respect to alleged § 10(b)
violations arising from misrepresentations in 2002 and alleged §
20(a) violations.

The parties shall appear for a pretrial conference on
April 21, 2006, at 11 a.m., in Courtroom 11A of the United States
Courthouse, 500 Pearl Street, New York, New York.

SO ORDERED.

Dated:    New York, New York
          March 31, 2006

                                        DENNY CHIN
                                        United States District Judge

---

[9]      Fed. R. Civ. P. 23.1 requires that the "complaint shall
. . . allege with particularity the efforts, if any, made by the
plaintiff to obtain the [desired] action . . . from the directors
. . . and the reasons for the plaintiff's failure to obtain the
action or for not making the effort."

- 29 -

**APPEARANCES:**

For Plaintiffs:

        GLANCY BINKOW & GOLDBERG LLP
           By:  Peter A. Binkow, Esq.
                Neal A. Dublinsky, Esq.
                Daniel Hargis, Esq.
        1801 Avenue of the Stars, Suite 311
        Los Angeles, CA  90067
          - and -
           By:  Robin Bronzaft Howald, Esq.
        1501 Broadway, Suite 1900
        New York, NY  10036

        MILLER SHEA PC
           By:  Powell Miller, Esq.
                Jayson Blake, Esq.
        950 West University Drive, Suite 300
        Rochester, MI  48307

        LABATON SUCHAROW & RUDOFF LLP
           By:  Christopher J. Keller, Esq.
                Shelley Thompson, Esq.
        100 Park Avenue, 12th Floor
        New York, NY  10017

        VANOVERBEKE MICHAUD & TIMMONY, P.C.
           By:  Michael VanOverbeke, Esq.
                Michael Moco, Esq.
        79 Alfred Street
        Detroit, MI  48201

        SMITH & SMITH LLP
           By:  Howard G. Smith, Esq.
        3070 Bristol Pike, Suite 112
        Bensalem, PA  19020

For Defendants:

        CLEARY GOTTLIEB STEEN & HAMILTON LLP
           By:  Jennifer L. Kroman, Esq.
                Neil P. Forrest, Esq.
                Catherine Sykes, Esq.
        One Liberty Plaza
        New York, NY  10006